**Opinion issued November 5, 2025.**



In The

# Court of Appeals

For The

# First District of Texas

_____

**NO. 01-25-00346-CV**

_____

## IN THE INTEREST OF E.N.T., A CHILD

---

**On Appeal from the 314th District Court**
**Harris County, Texas**
**Trial Court Case No. 2023-00732J**

---

## MEMORANDUM OPINION

D.R. ("Mother") and W.T. ("Father") challenge the trial court's final decree terminating their parental rights to their minor child E.N.T. ("Eva") based on the court's findings that Mother and Father each committed the predicate acts under

Texas Family Code Sections 161.001(b)(1)(D), (E), and (O),[1] and that termination of their rights was in Eva's best interest.[2]

We affirm the decree of termination.

## Background

On March 26, 2023, the Department of Family and Protective Services ("Department")[3] received a referral of neglectful supervision by Mother and Father after an Ulta Beauty store employee called 9-1-1 to report that an infant had been left alone in a parked car in the Ulta Beauty parking lot for a prolonged period of time. Police arrived at the scene and removed ten-month-old Eva from the car.

After conducting an investigation from March 26 through April 3, 2023, including interviews with Mother, Father, Eva's paternal grandmother, and the person who called 9-1-1 to report the car incident, the Department became concerned about Mother's and Father's unaddressed and continued use of illegal narcotics and

---

[1] The legislature has repealed subsection (O) effective September 1, 2025. H.B. 116, Act of May 28, 2025, 89th Leg., R.S., ch. 211, 2025 Tex. Sess. Law Serv. The repeal applies to suits affecting parent-child relationships pending in the trial court on the effective date of September 1, 2025. Because the notice of appeal in this matter was filed prior to the effective date, subsection (O) remains in effect for the purpose of this appeal. *See In re G.A.H.*, No. 05-25-00421-CV, 2025 WL 2697297, at *1 n.2 (Tex. App.—Dallas Sept. 22, 2025, no pet. h.) (mem. op.).

[2] To protect the identity of the minor child, we refer to her and her grandparents by pseudonyms and we refer to her biological parents as Mother and Father. *See* TEX. FAM. CODE § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

[3] For purposes of this appeal, the term "Department" also includes Harris County Child Protective Services.

its potential endangering impact on Eva. The Department filed a petition seeking managing conservatorship over Eva, seeking termination of Mother's and Father's parental rights to Eva and requesting temporary managing conservatorship over Eva on an emergency basis. In the removal affidavit attached to the Department's petition, Department investigator Briana Watson stated the Department was requesting temporary managing conservatorship of Eva because of the "ongoing danger" to Eva posed by Mother's and Father's unaddressed substance abuse. She stated that

> Both [Mother] and [Father] admitted [to leaving Eva] in the car for over an hour while inside of Ulta stealing merchandise. [Mother] . . . fled the scene due to not wanting to deal with the police and left [Father] to deal with law enforcement. Both parents willingly admitted to using heroin and abusing pills while actively []caring for [Eva] and stated they [had] recently used [drugs] two days prior to the intake coming in. There was an attempt to place a safety plan in place with paternal grandparents [Brad] and [Charlotte]. However, the safety plan fell through due to paternal grandparents stating that both parents still participate in active drug use. The child is at a vulnerable age and unable to self-protect. There is a continuing danger to the physical health or safety of the child, The Department believes it is in the best interest of the child to be in the care of the agency.

**Trial Testimony**

The court conducted a bench trial over nine non-consecutive days between September 11, 2024 and April 2, 2025.[4]

---

[4] Mother, who had been represented by counsel during part of the termination proceedings, proceeded pro se at trial, and she is represented by appointed counsel

## A. Dishaunda Gabriel

Caseworker Dishaunda Gabriel was assigned to the case from May 2023 until August 2024. She testified that Eva initially was removed from Mother's and Father's care because Mother and Father had left Eva alone in their car while they were inside an Ulta store and when it became involved, the Department became increasingly concerned about Mother's and Father's unresolved substance abuse issues because of repeated "positive drug testing." Mother and Father tested positive for fentanyl, norfentanyl, and amphetamines multiple times during the pendency of the case, and Father also tested positive for oxycodone, oxymorphone and methamphetamine. Mother provided prescriptions for two drugs for which she tested positive, but the Department was only concerned about the drugs for which Mother did not have a prescription—fentanyl, cocaine, marijuana, and methamphetamine.

Before Gabriel was assigned to the case, another caseworker had reviewed Mother's and Father's Family Service Plans ("FSPs") with them and made referrals for services. Gabriel reviewed Mother's and Father's FSPs with them when she visited their home in October 2023, and she provided each a copy of their FSP. Mother's and Father's FSPs required them to, among other things, complete

on appeal. There is no indication in the record as to why Mother appeared pro se during trial.

4

parenting classes, participate in a substance abuse assessment, participate in a psychological evaluation, submit to drug testing, and attend court hearings and parent-child visits. Because of the parents' repeated positive drug tests, she stated that "completing substance abuse services" was an integral part of the case.

When Gabriel visited Mother's and Father's home in October 2023, Mother and Father had completed their parenting skills classes, submitted to substance abuse assessments and psychological evaluations, and they had been submitting to monthly drug testing as required by their FSPs. Mother and Father were ordered to complete a second psychological evaluation and substance abuse assessment, however, because they had not been truthful. According to Gabriel, Mother and Father completed the additional psychological evaluations and substance abuse assessments.

Referring to a permanency report prepared by the Department, Gabriel testified that Mother's first substance abuse assessment recommended that she receive outpatient substance abuse therapy and take parenting classes, and her second substance abuse assessment recommended that she attend Alcoholic Anonymous and Narcotics Anonymous meetings, take parenting classes, receive individual substance abuse counseling, and receive outpatient substance abuse treatment. Mother did not report attending AA or NA meetings, nor did she provide documentation confirming she had completed outpatient treatment. Gabriel did not

5

recall referring Mother to outpatient therapy, but she referred Mother to individual counseling. Mother completed her parenting classes, but she was unsuccessfully discharged from substance abuse counseling on March 2, 2024, because she did not keep regular attendance, address all her treatment goals and objectives, and she failed to maintain her sobriety throughout treatment.

Mother's psychological evaluation recommended that she submit to a psychiatric assessment, receive individual therapy, attend parenting classes, receive substance abuse treatment, receive outpatient treatment, and submit to random drug screenings. According to Gabriel, Mother completed the psychiatric assessment and therapy but she did not complete the outpatient treatment.

Although Gabriel did not have any concerns about Mother's and Father's home in October 2023, she was concerned about returning Eva to Mother's and Father's care because both parents had continued to test positive for drugs. Gabriel testified that as a result of the parents' ongoing drug use, she could not ensure that their home was drug-free, which is important for a child as young as Eva. Although Gabriel made several subsequent attempts to visit Mother's and Father's home when they were both present, they were unable to agree on a time for the visit. The Department was concerned about Mother's and Father's parenting skills, and after a November 30, 2023 hearing, the trial court amended Mother's and Father's FSPs to include a requirement that they work with a parenting coach through the Nurturing

6

Parents Program ("NPP") until successfully discharged. Although she referred Mother and Father to NPP in January 2024 and she provided the referral information to Mother, Father, and their attorneys, neither parent completed the program or provided documentation to the Department establishing they had worked with a parenting coach.

When asked about Mother's and Father's drug testing, Gabriel testified that the Department initially required Mother and Father to submit to weekly drug tests, but it reduced the frequency of testing to twice a month after October 9, 2023, when the court ordered Mother and Father to submit to weekly testing for fentanyl through National Screening Center's ("NSC") random drug testing program. She testified that Mother did "[n]ot often" comply with these drug testing requirements.

Mother tested positive for fentanyl, amphetamines, cocaine, marijuana, and methamphetamine throughout the pendency of the case. Mother's drug tests were admitted into evidence over Mother's and Father's objections.[5] Gabriel testified over Father's objections that Mother's March 29, 2023 urine sample tested positive for amphetamines, cocaine, and marijuana, that her April 28, 2023 hair sample tested positive for amphetamines, cocaine metabolites, and marijuana, and that her May 30, 2023 urine sample tested positive for methamphetamines and fentanyl. On

---

[5] Although Gabriel testified to Mother's positive tests results for benzodiazepines, we have not included them in our discussion because Mother provided the Department with verified prescriptions for alprazolam (Xanax) and lorazepam.

October 18, 2023, Mother's urine sample was negative, but her hair sample tested positive for amphetamines. On October 24, 2023, Mother's urine sample tested positive for fentanyl and norfentanyl, and her hair sample tested positive for amphetamines. On November 6, 2023, Mother's urine sample tested positive for fentanyl. On November 9, 2023, Mother's urine sample was negative, but her hair sample tested positive for amphetamine and fentanyl. Although her November 21, 2023 urine sample was negative, Mother's November 29, 2023 urine sample tested positive for amphetamine and fentanyl. Mother's December 7, 2023 urine sample was negative, but her December 11, 2023 urine sample tested positive for fentanyl, and her December 14, 2023 urine sample tested positive for amphetamine. On December 20, 2023, Mother's urine sample tested positive for fentanyl, and her December 28, 2023 urine sample was negative. Mother's January 4, 2024 urine sample tested positive for amphetamine and norfentanyl. Mother's January 8, January 9, January 12, January 26, February 9, and February 16, 2024 urine samples were negative. Mother did not submit to drug testing by NSC on February 21, 2024, and the urine sample she provided on February 22, 2024 for the Department-ordered drug test was negative.

Gabriel testified that Mother's most recent drug test was on March 8, 2024, and Mother's hair sample tested positive for amphetamines, methamphetamines, and

fentanyl. Although Mother was sent for drug testing in April, May, June, and July 2024, the Department did not receive drug test results for those months.

During a July 2024 hearing, the court ordered Mother to take a drug test and restricted Mother's visitations with Eva until Mother provided a clean test result. Gabriel did not know if Mother submitted to the court-ordered drug test in July 2024, and she did not know if Mother submitted for regular drug testing in August 2024, because Gabriel left the Department on August 5, 2024.

Gabriel testified that Father's FSP required him to attend parenting classes, submit to a substance abuse assessment and a psychological evaluation, submit to random urinalysis, and attend court hearings and parent-child visits. According to Gabriel, Father completed his parenting classes and substance abuse assessment. Father's substance abuse assessment recommended that he receive inpatient services, continue with random drug testing, and receive substance abuse counseling. Gabriel testified that Father did not provide her with documentation demonstrating that he completed inpatient treatment and Father's closure summary from Monarch Family Services stated that although he completed twelve recommended substance abuse therapy sessions, he continued to test positive throughout treatment, and "he did not meet his therapeutic goals."

Father's psychological evaluation recommended that he receive individual counseling and "continue [a] psychoactive medication regimen." Father's closure

9

summary from Monarch stated that he "did not meet his treatment plan goals due to lack of attendance" and he was unsuccessfully discharged from individual counseling. Gabriel did not know if Father continued to take his medications and although she had asked Father to provide her with a copy of his prescriptions, he did not do so or explain why he did not provide the requested information.

Father's drug test results were admitted into evidence over Mother's and Father's objections. Over Father's objections, Gabriel testified that Father's March 29 and April 28, 2023 urine samples tested positive for amphetamines, that his April 28, 2023 hair sample was negative, and that his May 30, 2023 urine sample tested positive for amphetamines, fentanyl, and norfentanyl. On October 18, 2023, Father's hair sample tested positive for oxycodone and his urine sample tested positive for oxycodone and oxymorphone. Father did not appear for fentanyl testing with NSC on October 24, 2023. On October 26, 2023, Father's urine sample tested positive for norfentanyl and amphetamine and his October 30, 2023 urine sample tested positive for norfentanyl. On November 9, 2023, Father's hair sample tested positive for fentanyl and amphetamine and his urine sample tested positive for norfentanyl. Father's November 20, 2023 urine sample tested negative, but his November 21, 2023 urine sample tested positive for norfentanyl. Father's November 29, 2023 urine sample tested positive for amphetamines and norfentanyl and his December 7, 2023 urine sample tested positive for norfentanyl. Father's

December 11, December 20, and December 21, 2023 urine samples were negative. Father's December 28, 2023 urine sample tested positive for amphetamines, his December 29, 2023 urine sample was negative, and his January 9, 2024 urine sample tested positive for norfentanyl. Father's February 9, 2024 urine sample tested positive for amphetamines and norfentanyl, his February 22, 2024 urine sample tested positive for amphetamines, and his February 28, 2024 urine sample tested positive for amphetamines and methamphetamines. Father did not appear for fentanyl testing on March 14, 2024, and his March 19, 2024 urine sample tested positive for amphetamines and methamphetamines. Father did not appear for fentanyl testing with NSC on February 16 and 26, 2024, March 14, 2024, April 3, 11, 16, 23 and 30, 2024, and May 17, 2024.[6]

Gabriel testified that the Department had safety concerns for Eva due to Father's continued substance abuse. The Department was concerned that Father had tested positive for amphetamines throughout the pendency of the case and, although the Department requested the information several times, Father did not provide the Department with proof that he had a prescription for Adderall, which could have explained his positive amphetamines results. The Department also was concerned that Father had tested positive for fentanyl and methamphetamines on more than one

_____

[6] Although NSC terminated Father's participation in the fentanyl testing program on April 23, 2024, the Department requested that NSC keep Father in the program until the next court date.

occasion after Eva was taken into the Department's care. Gabriel testified that Father's records reflected he had stopped drug testing in March 2024, and although the Department continued to send Father for drug testing, Gabriel did not receive any other drug test results for Father. The Department was concerned because Father's refusal to submit to further testing during trial indicated that he was continuing to use drugs.

Gabriel testified that Mother and Father had scheduled visits with Eva every first, third, and fifth Wednesday and every second and fourth Friday at the Department's office from 11:30 a.m. to 1 p.m. Over the course of fifteen months— between May 2023 and August 2024—Father visited Eva only twice at the Department's offices. Gabriel, who did not supervise Father's visits with Eva, testified that the Department did not have any concerns about Father's visits, and she did not have an opinion on Father's parenting skills.

According to Gabriel, Mother attended most of her scheduled visits between May 2023 and August 2024 and she supervised Mother's visits. Gabriel testified she was concerned about Mother's parenting abilities, which Gabriel described as an integral part of the case. Mother, who often arrived late for her visits, was often distracted during the visits, she "seemed a little dazed," and not completely focused on Eva. She would spend time on her phone, and she would try to discuss the case with Gabriel instead of focusing her attention on Eva. Mother would also miss

feeding cues from Eva and would try to feed her anyway. According to Gabriel, reading Eva's cues is something that Mother should have learned during her parenting classes.

In addition to visiting Eva at the Department's offices, Mother, Father, and the Department had entered into a mediated settlement agreement that allowed Mother and Father to visit Eva twice a month on the weekends with her caregivers. According to Gabriel, Brad and Charlotte supervised the weekend visits that began in February or March 2024. One of the stipulations in the agreement was that Mother and Father had to be sober when they visited with Eva.

On July 24, 2024, the trial court held a special status hearing to address the Department's request that Mother's visits with Eva be changed from in-person to virtual. According to Gabriel, the Department made the request because of "the inconsistent drug testing and because of [Mother's] behavior towards the Department." Gabriel testified that Mother was disrespectful, aggressive, and argumentative towards Gabriel during some visits when Eva was present.

The trial court suspended Mother's visitation in July 2024, and the court indicated it would resume visitations when Mother provided a negative drug test and could act civilly when she visited Eva. The court ordered Mother and Father to test for fentanyl, but Gabriel never received documentation demonstrating that Mother and Father complied with the trial court's order for drug testing. According to

Gabriel, Mother's visitations were still suspended when Gabriel left the Department in August 2024.

Gabriel stated the Department was concerned about Mother's and Father's financial abilities and Mother's lack of employment because one of the reasons Eva had come into their care was that Mother and Father had been shoplifting at Ulta when they left Eva alone in the car. Mother was employed for one week, but she never provided proof of employment through paycheck stubs or showed proof of income through disability checks, unemployment payments, or anything else. Father gave Gabriel pay stubs in August 2023 and although she asked Father multiple times to provide new pay stubs, she never received additional documentation of income from Father.

**B.** **Psychological Evaluations and Substance Abuse Assessments**

Father's August 9 and October 19, 2023 psychological evaluations and his October 25, 2023 substance abuse assessment were admitted into evidence without objection. Mother's August 11, 2023 psychological evaluation and July 20 and October 23, 2023 substance abuse assessments were also admitted without objection.

**1.** **Father's Psychological Evaluations**

In his August 9, 2023 psychological evaluation, Father reported that Mother went into the Ulta store to shop while he waited with Eva in the car. At one point, "he ran into the Ulta twice to rush [Mother], leaving [Eva] in the car both times with

14

the car running and AC on," and the car was locked.  According to Father, the second time he went into the store to rush Mother, store employees accused him and Mother of stealing, and the store manager called the police to report that Eva was in the car alone.  Father told the evaluator that the "police alleged that there was a powdered substance in the[] car which they tested and said was fentanyl."  He denied that the powdered substance belonged to either him or Mother and he told the evaluator that the removal affidavit included many untrue statements.

With respect to his past substance use, Father reported that he used marijuana in the past and he was physically dependent on hydrocodone when he was in college, and he had "admitted himself into a detox facility for it."  Father reported that he had "fully detoxed and never relapsed on hydrocodone after his treatment."  The evaluator noted that Father had made conflicting reports about his hydrocodone use in his July 18, 2023 substance abuse evaluation in which he reported that he had "last used opiates just before the [car] incident with [the Department]" in March 2023.

Father told the evaluator he had taken drug tests for the Department and "they have all been negative," but Mother had tested positive for marijuana.  He stated that he, Mother, and Eva had been living with Brad and Charlotte until they kicked Mother and Father out, and that Charlotte had falsely testified during a status hearing she had seen him and Mother "passed out with their eyes rolled back."

15

In her evaluation, the evaluator noted that Brad and Charlotte had agreed to serve as safety monitors for Mother and Father, and that Mother, Father, and Eva had lived with Brad and Charlotte until Charlotte told the Department in April 2023 that she did not want Mother and Father in her home "due to their ongoing drug use." According to the evaluator, Father had a "notable substance abuse history involving primarily opiates" and although he went through suboxone treatment when he stopped using in college, Father "recently relapsed just prior to the [Department's] case by using an opiate." She stated that Father "may have even used after the [Department's] case due to reports from [Charlotte] that he continued to use in her home and his report to [the Department] that he and [Mother] were going through detox around that same time." Father was diagnosed with opioid use disorder.

In his October 19, 2023 psychological evaluation, Father stated he had self-initiated seven days of inpatient treatment in 2016 to address his hydrocodone dependence, but that he had "recently relapsed" and used hydrocodone one to two weeks earlier (in early October 2023) when he found a pill in his car. He stated that prior to his relapse, he had not used hydrocodone in years. He also reported that he had tried cocaine in college and last used the drug in 2016.

Father's psychological evaluation recommended that he receive substance abuse outpatient treatment, participate in individual therapy, and submit to random drug screenings. The February 22, 2025 permanency report states that Father had

not complied with the recommendations because he had been unsuccessfully discharged from outpatient treatment, he was not drug testing through the Department, and he had been unsuccessfully discharged from individual therapy. With regard to Father's drug testing requirement, the report states that Father was not drug testing through the Department, he was "dropped from [NSC's] [f]entanyl program twice due to several no shows," and he refused to submit to court-ordered drug testing with NSC.

### 2.    Father's Substance Abuse Assessments

During his October 25, 2023 substance abuse assessment, Father stated that Mother shopped at Ulta and he waited in the car with Eva because she was sleeping. Father stated that he wanted to "speed things up" and he "went back and forth from the store and car," before a store employee accused him and Mother of stealing and called the police. After the police found Eva in the car alone, they searched the car and "found prescription medication not in the bottle and opiates." According to Father, he was allowed to leave with Eva and Mother was arrested.

Father reported using "an assortment of opiates throughout college" and "he had a slip up after his kid got removed, he had a slip up" at the end of September 2023 or beginning of October 2023. Father stated that "he took half a Xanax because he had a lot of anxiety, so he took 2 more" and he "didn't know they were pressed/blanks laced with fentanyl." He stated that the "last time he used [Xanax]

17

was a day after his kid was removed." The evaluator noted that Father "appeared to be very guarded with his information [regarding drug use], [his reported] timelines of use appeared to be inconsistent, [because] he [first] reported that [he last] consumed opiates in 2016 however [he] later reported that he used one opiate before the incident with [the Department] occurred." Father also told the evaluator that the Department "administer[s] a drug analysis on him, they have all been negative however they went back and re-tested the initial test and it came back positive for opiates." Father was diagnosed with opioid use disorder, moderate.

Father's substance abuse assessment recommended that he participate in outpatient substance abuse therapy, receive substance abuse education, and be reassessed if he tested positive for drugs. The February 22, 2025 permanency report states that Father had not complied with the recommendations because he had been "unsuccessfully discharged from substance abuse therapy due to not meeting his therapeutic goals."

### 3. Mother's Psychological Assessment

During her August 11, 2023 psychological assessment, Mother stated that the Department became involved after Mother and Father "went into an Ulta Beauty store while [Eva] was asleep in the car." Mother stated that she "was gone for 45 minutes in the store while the baby was locked in the car with air conditioning running."

Mother reported that "she ha[d] a history of substance abuse," and that she had used cocaine "about three times throughout college." The last time she used cocaine was on March 18, 2023, one week before Eva was found alone in the car. Mother stated that the last time she used marijuana was in March 2023, and she used marijuana socially about twice a month. She also reported that her "drug use may be the source of some problems in her life," her problems with "strained interpersonal relationships, vocational and/or legal problems, and use of drugs to manage stress." The evaluator observed that Mother's "level of treatment motivation is somewhat lower than is typical of individuals being seen in treatment settings" and her "responses suggest that she is satisfied with herself as she is, that she is not experiencing marked distress, and that, as a result, she sees little need for changes in her behavior."

The evaluator recommended that Mother participate in individual therapy, attend parenting classes, receive ongoing outpatient substance abuse treatment, and submit to random drug screenings. The February 22, 2025 permanency report states that Mother had not complied with the recommendations because although she had completed parenting classes, she had not begun services with NPP, she was not participating in therapy sessions, she was not drug testing through the Department, she had been "dropped from [NSC's] [f]entanyl program due to several no shows," and she refused to submit to court-ordered drug testing with NSC.

19

### 4. Mother's Substance Abuse Assessment

During her October 23, 2023 substance abuse assessment, Mother reported that the Department became involved after she went shopping at Ulta and Father ran into the store to check on her and tell her to check out, leaving Eva in the car alone. Mother stated that "she didn't feel like it was a big deal to leave [Eva] in the car for a short bit" when it happened. According to Mother, Father was just checking on her and wanting her to finish up her shopping. Mother stated that they could see the car from inside the store and it was running with the air conditioning on, and its doors were locked.

Mother reported that she started using fentanyl in powder form "last year," that she snorted a line of fentanyl once a month on the weekends, and that the last time she used fentanyl was in May 2023. She denied that she and Father had ever used fentanyl in the home and instead, they would "take turns going out and having fun, or, they would have someone babysit so they could both go out." Mother stated that she did not know there was fentanyl in the car, and she noted that criminal charges were never filed against her or Father with regard to the fentanyl.

Mother submitted to a drug test in March 2023 and she tested positive for marijuana and cocaine. She claimed that she had smoked marijuana with a friend, and she believed that the "weed was laced with cocaine" because she had not used cocaine. Mother stated that she had smoked marijuana "about 5 times" and as

recently as May or June 2023. She reported that she had smoked or snorted a bump of cocaine three times during college, and she had used cocaine most recently on March 18, 2023. Mother was diagnosed with Stimulant Use Disorder, Mild, cocaine.

Mother's substance abuse assessment recommended that she participate in outpatient treatment, receive individual substance abuse counseling, and attend parenting classes, AA/NA meetings, and mental health counseling. Mother was diagnosed with opioid use disorder, moderate/severe, in early remission, alcohol use disorder, mild, in early remission, cannabis use disorder, mild, and in early remission, and stimulant use disorder, mild.

The February 22, 2025 permanency report states that Mother had not complied with the recommendations because although she had participated in outpatient treatment, her attendance was inconsistent and she was not successfully discharged, she had not provided the Department with proof that she was attending NA/AA meetings, she had not provided proof that she was attending individual therapy to address her mental health, and Mother was not complying with the Department's monthly requests for drug testing.

## C. Lorena Nava

Lorena Nava, a licensed chemical dependency counselor with Monarch Family Services, testified that she completed two substance abuse assessments for Father and diagnosed him with opioid use disorder. Father received substance abuse

counseling from Monarch and although he attended the required number of weekly sessions, he received an unsuccessful discharge because he continued to test positive for drugs.

Nava testified that Father admitted to using drugs when he was first referred, but since then he had repeatedly denied using drugs and he never admitted to relapsing. Nava had discussed Father's positive drug tests with him during therapy, and she was concerned that Father denied using drugs while testing positive for drugs because denial of substance use is a barrier to a client being able to address his substance. Although he was cooperative, he appeared angry and accused the Department of "trying to set him up" and claimed that his drug tests were being manipulated. Nava testified that Father's attitude interfered with his counseling sessions because she had a hard time redirecting him to the substance abuse therapy itself.

## D. Bruce Jefferies

Bruce Jefferies, the owner of National Screening Center, discussed the process of collecting hair and urine samples and sending the samples to different laboratories for testing. Jefferies testified that amphetamine and fentanyl are prescription medications and norfentanyl is a metabolite of fentanyl. According to Jefferies, a positive test for norfentanyl means that the person previously used fentanyl. Jefferies testified that amphetamines and fentanyl generally are detectable

in a person's urine for one to three days after use, but they have been detected as many as five days after use. Amphetamines and fentanyl can be detected in a hair follicle taken from the person's head for ninety to 100 days after use and in a follicle removed from elsewhere on the body as long as six months after use. When asked why a person might have a positive test result for norfentanyl, but a negative result for fentanyl, Jefferies testified that a positive test for norfentanyl means that the metabolite is present in the person's body and "that is a positive for fentanyl." Jefferies testified that if someone tests positive for methamphetamine, "they either used the illegal street drug meth" or the medication Desoxyn, which requires a prescription.

When asked if it was unusual for a person to have multiple tests with different results, Jefferies testified that hair is not homogeneous and "[n]ot every hair contains a metabolite of any type of drug that we're looking for." According to Jefferies, "there's no such thing as a false positive."

## E. Ronald Zapata

Deputy Ronald Zapata with the Harris County Sheriff's Office was dispatched to the Ulta Beauty store parking lot on March 25, 2023. He observed Eva sitting alone in the back seat of a car with its engine running. Eva was awake and calm, and although she did not appear to be in distress, Deputy Zapata was concerned

about her wellbeing because it was a hot day, and she could have been dehydrated. Eva was uninjured when EMS removed her from the car.

Based on his investigation, Deputy Zapata determined that Eva had been left alone in the car for at least fifteen to twenty minutes, and no one had checked on her during that time. EMS personnel treating Eva had searched the car for diapers and formula and discovered a small cylinder containing what appeared to be illegal substances. Deputy Zapata collected the cylinder and submitted its contents for forensic testing. He also found a prescription bottle with Father's name on it containing pills that did not match the prescription. Father told him that the pills belonged to Mother. When asked about his interactions with Mother, Deputy Zapata testified that Mother seemed "numb" and "careless," and she did not appear to be concerned about Eva. Deputy Zapata testified that he contacted the Department due to the presence of drugs in the car.

## F.    Leonard Pecot

Deputy Leonard Pecot with the Harris County Sheriff's Office testified that when he arrived at the scene, he saw Eva in the backseat of the car and he was concerned for her safety because she was screaming loudly, sweating, and appeared to be in distress. He did not recall if the car's engine was running, or if the air conditioning was on.

Deputy Pecot found Mother approximately fifteen to twenty minutes after Eva was removed from the car. Mother was near a Smoothie King, approximately three quarters of a mile from the scene, and she was walking in the opposite direction of Ulta. According to Deputy Pecot, Mother was "nonchalant" and appeared to be "unconcerned about what had just happened." He detained Mother for suspicion of child endangerment and brought her back to the scene where she was arrested by Deputy Zapata for possession of a controlled substance—the Xanax found in Father's prescription bottle. Deputy Pecot testified that he had received training in field sobriety testing but could not state whether either parent was impaired.

## G.    Brad

Brad is Eva's paternal grandfather. He and his wife Charlotte have been together for twenty-seven years and they have lived in the same home for eighteen years. The Department told Brad that it had opened an investigation because Eva had been left alone in a car. The Department implemented a safety plan that required Mother, Father, and Eva to live with him and Charlotte and they would monitor Mother and Father.

When asked if he observed any concerning events when Mother and Father were living with them, Brad testified "they would just have bizarre behavior at times." Mother was incoherent sometimes and spoke nonsensically and Brad did not see Father often because Father worked a lot and came home late. According to

Brad, Mother did not seem "rational," and she seemed a "little loopy" in the evenings, but he chalked her odd behavior up to stress. Mother "sometimes in the evenings would hold the baby kind of wildly or not considered safe" and one night Mother and Father went to their apartment to get something, and they did not return to Brad's home until 1 a.m. According to Brad, Mother and Father were "sluggish" when they arrived. Brad testified that Father had a history of substance abuse. According to Brad, Father had been prescribed suboxone to assist with his withdrawal symptoms. Brad, a pharmacist, testified that suboxone is used to treat opioid addictions.

Brad testified that Mother and Father initially visited Eva at the Department's offices, and he and Charlotte arranged for extra visits on the weekends. According to Brad, Mother and Father visited with Eva for a few hours almost every weekend. He testified they were late to their weekend visits 70% of the time. Mother and Father entered into a mediated settlement agreement with the Department in February 2024 that included safety measures for Brad and Charlotte and required Mother and Father to fulfill certain criteria to visit with Eva, including being sober.

Brad testified that that the weekend visits became more "hostile" after the agreement was signed. According to Brad, Mother "would have words" with Charlotte that "sounded somewhat threatening" and "did not sound safe" to Brad. Brad, who worked every other weekend, testified that he was concerned for

26

Charlotte because of Mother's "unfriendly" tone and demeanor and, based on his conversations with Charlotte, Brad was concerned about Charlotte supervising visits between Mother and Eva without him present. Brad testified that they stopped weekend visits because he was not going to put Charlotte or Eva in "jeopardy." When asked if it was "a fair assessment that [he] stopped the plan due to safety concerns," Brad testified, "Predominately yes." Since that time, Brad had not received any information or indication that made him feel more comfortable about scheduling new visits with Mother.

Brad was concerned that Mother and Father were not completing their services or drug testing, and this was part of the reason that he decided to stop supervising visits between Eva and Mother and Father. According to Brad, he and Charlotte did not "know [Father's or Mother's] state of mind" or "what's going on," and they had a responsibility to Eva and did not want to "take that chance." Brad denied that he and Charlotte were trying to prevent Mother and Father from seeing Eva and testified that Mother and Father were still able to visit with Eva at the Department's offices.

Brad testified that Father met with Eva on November 6, 2024, and the visit went "great." According to Brad, Eva was still well-bonded with Father, and he did not have any concerns about the visit, and he was willing to facilitate and supervise future visits between Eva and Father. Brad testified that he loved Father, and he

27

wanted Father to be a parent to Eva even if Father's parental rights were terminated. He was also willing to allow Mother to visit Eva if he was present.

Brad testified that he and Charlotte have cared for Eva since the Department was appointed as Eva's temporary managing conservator and Eva has been doing "fantastic" in their care, and they had been able to meet all her needs. He believed that Eva deserved stability and permanency in her life, and he was willing to provide that to her and he was willing to adopt Eva if Mother's and Father's parental rights were terminated. Eva, who is a happy child, was attending gymnastics and he intended for Eva to participate in sports and attend college like his teenaged daughter. Brad testified that Father had been working for seven years, and he had worked for his current employer for four or five years, and although it was not necessary, it would be helpful if Father contributed financially to Eva's care.

Brad testified that it was in Eva's best interest for her to have a stable lifestyle, including stable caregivers, and he was concerned about Mother's and Father's decision-making skills because that is why they were in court to begin with, and Brad did not believe "they make good quality decisions as a good parent should have."

Brad testified that Mother and Father had been together and living as a couple the entire time the case was pending. Brad testified that he wanted Mother and Father to remain in contact with Eva, but he was concerned that they had not been

able to maintain sobriety and complete services while Eva was in the Department's care, and he testified that based on their past behavior "it doesn't look promising" that Mother and Father would remain drug-free if the Department was not involved in their lives. He would do whatever he needed to do to keep Eva safe and he was willing to allow Eva to have a relationship with Mother and Father once he and Charlotte felt that Mother and Father were "stable" and "clean."

Brad was not willing to share custody of Eva with Mother and Father because he had not seen any indication of improvement by Mother and Father since Eva had moved into his home. According to Brad, Mother and Father had not "trended in the right direction with everybody looking after them" and there was no reason to think they would change.

Before Charlotte, Brad had been married to Naomi, Father's mother, and Brad has a good relationship with Naomi. According to Brad, they have been able to facilitate visits between Eva and Naomi and the visits are going well. He does not have any concerns about Eva while she is around Naomi, and he was never concerned about Father when Father lived with Naomi.

## H.    Charlotte

Charlotte is Father's stepmother. When asked how the Department became involved with the family, Charlote testified that Father told her that he and Mother were shopping at Ulta, and they left Eva alone in the car because she was asleep.

29

Father told Charlotte that Mother was charged with possession of "tablets or medication or something like that." When asked if anyone said anything to her about "about any other drugs that were found in the vehicle," Charlotte testified that Father told her that the police found "opioids" in the car and "they were his."

Father, Mother, and Eva stayed with Charlotte and Brad for about a week under the terms of a safety plan prepared by the Department which, according to Charlotte, required "one of the parents [] to stay with [Eva] in [Brad and Charlotte's] house." When asked if she had any concerns about Mother and Father staying in her home, Charlotte testified that most of her concerns were "drug related, just not— odd behavior. . . Maybe not drug related, just odd behavior."

Charlotte testified that Mother had exhibited a lot of "odd behavior" while she stayed in Charlotte's home, including one day when Mother "just acted really confused" and she was not focused on Eva. When asked to describe Mother's odd behavior, Charlotte testified that Mother "was kind of all over the place" and "[m]aybe a little manic." Instead of focusing on Eva, Mother was more concerned about contacting the families of "two girls [Mother claimed] were killed or died" in jail, and Charlotte found this to be extremely odd. According to Charlotte, Father appeared to be concerned about Mother's behavior as well, and he told Charlotte that Mother "was in some sort of psychosis type" and Father had "never seen [Mother] like that" before.

30

When asked if Mother exhibited any other concerning behavior, Charlotte testified that she saw Mother and Eva in the living room and Mother was "kind of slumped over in the chair" while Eva was "kind of crawling all over." Charlotte testified that she was concerned that Eva might get hurt, so she grabbed Eva and took her to another room. Charlotte, who was getting ready for work, woke up Brad and asked him to watch Eva because she was concerned about Mother's ability to care for the young child.

With respect to Father, Charlotte testified that he worked during the day and he "came over in the evenings, not every evening." According to Charlotte, when Father came home from work, Mother and Father would leave Eva with Brad and Charlotte and go "do something at their house." Charlotte testified that Father's conduct was concerning to her because Mother and Father would return a few hours later than they said they would. When asked if she was concerned by any of Father's other conduct, Charlotte testified that "[t]here was just a lot of napping and sleeping on the weekends but other than that, no."

According to Charlotte, Mother and Father left one evening and did not return until 6 p.m. the next day when they were scheduled to meet with a Department caseworker. Charlotte told the Department that she believed that Mother and Father had violated the safety plan by not always having at least one parent in the home

31

with Eva. Charlotte, who wanted Mother and Father to move out of her home, told the Department that she was willing to continue to care for Eva as needed.

Charlotte testified that when the case began, she only wanted to "help [Mother and Father] get better and to have [Eva] safe," but she became concerned that Mother and Father had substance abuse issues. According to Charlotte, Father told her that he had "some opioid problems before" and he had been to rehab and his drug of choice at that time was "heroin or opioid or something to that form." Father had talked to Charlotte about going through withdrawal and about Mother going through withdrawal. Charlotte did not know if Mother and Father went through withdrawal when they were living in her home.

Charlotte testified that Mother and Father were able to visit Eva at the Department's office throughout this case and the Department and parents had signed the agreement that allowed Mother and Father to visit with Eva twice a month on the weekend for two hours and Brad and Charlotte would supervise the weekend visits. According to Charlotte, the weekend visits generally lasted for two hours unless Mother and Father left early, and it was "fairly common" for Mother and Father to be late to the visits. Charlotte and Brad had been willing to supervise the visits because they had hoped that Mother's and Father's circumstances would improve.

Charlotte testified that she and Brad supervised twenty-four visits between Eva and Mother and Father before the agreement was signed in February 2024 and eleven visits afterwards. Brad and Charlotte stopped allowing Mother and Father to visit with Eva in June or July 2024 because Mother and Father were not doing their services or submitting to drug testing, and Mother had been hostile and "nasty" towards Charlotte in Eva's presence during two visits and Charlotte worried about the impact witnessing these encounters had on Eva.

When asked why Father had not been attending visits with Eva that were supervised by Charlotte and Brad, Charlotte testified that Mother and Father are "together and a unit and this is family reunification" and she and Brad were concerned because Father "hadn't tested." Charlotte testified that she and Brad had not seen any progress on Father's part, and it would have made a "big difference" to her if Father had "completed services and been testing negative for the Department." When asked if she was concerned that Mother and Father "were not taking the case seriously," Charlotte testified that there "hasn't been any change it doesn't seem." Although they had stopped having weekend visits, Father was still able to visit Eva during weekly visits supervised by the Department. A Department caseworker told Charlotte that Father had been scheduled to visit Eva on October 30, 2024, but Father canceled the visit.

33

On November 6, 2024, after trial began, Brad and Charlotte supervised a weekend visit between Father and Eva that Mother was not allowed to attend. According to Charlotte, Eva is bonded with Father, he behaved appropriately during the last visit, and she and Brad were open to supervising future visits between Father and Eva.

Charlotte testified that Eva is currently in gymnastics and if she and Brad adopt Eva, they intend to enroll her in pre-K and they plan to keep Mother and Father involved in Eva's life if it is safe to do so. According to Charlotte, Eva was "up-to-date with all of her medical" and they were following up on the doctor's recommendations with regard to some of Eva's ongoing issues. Charlotte testified that she had kept Mother and Father informed about Charlotte's medical issues, daycare reports, and sent photographs, and she included the Department caseworker in these communications. She testified that it would be helpful if Father were to contribute some money towards Eva's care, but she and Brad were able to provide for Eva without Father's assistance.

Charlotte testified that she had a good relationship with Father's mother, Naomi, and she and Brad are in regular contact with her. Charlotte believes that it is important for Eva to have a relationship with Naomi, and she does not have any concerns about Naomi's ability to care for Eva.

Charlotte stated that she was able to meet all of Eva's needs and was willing to adopt Eva if Mother's and Father's parental rights were terminated. She testified that she wanted Eva to have a relationship with Mother and Father, but she was concerned that it might be difficult to do because it was not in Eva's best interest to witness Mother acting hostilely towards anyone and Charlotte wanted to ensure that Eva was "not in the middle of all that."

Charlotte testified that she did not want to share conservatorship with Mother and Father because they had threatened to sue Charlotte and Brad and Charlotte did not believe a future custody battle was in Eva's best interest. She was also concerned for her safety because of Mother's past threats and hostility towards her and she was concerned for Eva's safety. According to Charlotte, Mother had also accused Charlotte and Brad of committing identity theft, insurance fraud, obstruction of justice, and perjury. Charlotte denied ever being in an inappropriate sexual relationship with Father, as Mother had alleged, or making any sexual advances towards Father. Charlotte was also concerned about sharing conservatorship with Father because he continued to be in a relationship with Mother throughout the entirety of this case.

During a June 13, 2023 show cause hearing, Charlotte testified that Mother appeared intoxicated when she was living with them and supposed to be caring for Eva. According to Charlotte, Mother would be "unsteady, unbalanced, sluggish,

35

sleepy, and then in a few hours, she would be very happy and joyful. So it was a lot of back and forth."

Charlotte testified that she became concerned when she saw Mother sitting in a chair "with her head cocked back, eyes wide open while [Eva] was climbing on her." She testified that Father told her that he, Mother, and Eva needed to stay with them because he and Mother had been using drugs and they "needed to get clean." According to Charlotte, the plan was for one parent to "detox" first and then the other, so that way they were not going through withdrawal symptoms at the same time.

Based on Father's statements, Charlotte understood that Father had known that Mother had been using drugs before the Department became involved with the family, and he nevertheless left Eva with Mother while he was at work. Charlotte testified that Father told her he had been to rehabilitation for substance abuse problems, but he left early and did not finish the program.

## I.    Joy Franklin

Joy Franklin, Eva's guardian ad litem, testified that Child Advocates was appointed to the case in July 2023. A Child Advocates volunteer visits with Eva and Brad and Charlotte in their home at least once a month and Eva is "thriving" and "doing outstanding" in her current placement. Brad and Charlotte are bonded with Eva, they have excellent parenting skills, they have been able to meet all her needs,

36

and they are willing to adopt Eva if Mother's and Father's parental rights are terminated. Franklin testified that it is a protective placement and Child Advocates trusted Brad and Charlotte "to be a gatekeeper to contact with the parents."

Franklin testified that Child Advocates believed that termination of Mother's and Father's parental rights was in Eva's best interest because neither Mother nor Father successfully completed their service program, they both "tested positive for fentanyl, which is a very dangerous drug, on multiple occasions," neither parent had demonstrated the "ability to understand the seriousness of [fentanyl]," nor had they demonstrated "the willingness to get sober and have a safe, healthy lifestyle for their child." According to Franklin, neither Mother nor Father "seem[ed] to take any responsibility for the situations that they've been in and the drugs that they are using." When asked why she believed Mother and Father refused to take responsibility, Franklin testified that Child Advocates had "talked to them many occasions since the very beginning of the case" about the seriousness of fentanyl use and offered to help Mother and Father.[7] According to Franklin, Mother and Father did not admit to "any substance abuse at all," including fentanyl, and reported they "had no problems," even though they continued to test positive for drugs. Mother

---

[7] Franklin did not specify the type of help Child Advocates offered to Mother and Father.

and Father claimed they were testing positive for drugs because "people [were] switching their tests in National Screening."

Mother and Father stopped meeting monthly with Child Advocates in December 2023, and they only communicated with Child Advocates through "text message or very short phone calls."

Franklin testified that she observed one visit with Mother and Eva in December 2023 or January 2024, and she was concerned that Mother did not "fully understand[] how to engage with [Eva], how to properly play with her or to notice the cues of the child when the child is sleepy or, you know, need[s] something different or is hungry." Franklin had not observed a visit between Father and Eva, and she noted that Father had not been visiting with Eva "for quite some time."

Franklin testified that Child Advocates supported termination of the parents' rights over conservatorship because Mother and Father had consistently tested positive for drugs, including fentanyl, which is "a very serious drug," and Child Advocates was concerned that Eva would be exposed to Mother's and Father's drug use if Mother and Father were appointed as Eva's possessory conservators. According to Franklin, it was not in Eva's best interest to appoint Brad and Charlotte as Eva's conservators and Mother and Father as Eva's possessory conservators because Mother and Father had been "very. . . argumentative" with Brad and Charlotte, and Mother had been "very aggressive" towards Charlotte. Franklin

testified that it would have a detrimental effect on Eva if she were exposed to a "combative relationship" between her parents and grandparents. According to Franklin, Mother had harassed and made "threatening allegations" against Brad and Charlotte and Child Advocates, and she had repeatedly accused Brad and Charlotte of hurting Eva, and "not treating [Eva] right" even though there had been no indication of abuse.

Franklin testified that it is in a child's best interest for a parent who uses drugs to address the issue through drug treatment or services. Franklin was not aware that Mother or Father had addressed their drug use through any type of services even though they had an opportunity to do so during the pendency of the case. Franklin received the drug tests during the case. She was aware that the parents had tested positive for substances other than fentanyl, and Child Advocates was concerned about these positive drug tests as well. Even if Mother and Father tested negative for drugs that day, she indicated she would still be concerned about Eva's safety if she were returned to them because Mother and Father had not successfully completed a substance abuse program, they stopped drug testing, and they had not been "working with all of us to help them get sober and clean to be a parent." According to Franklin, "a negative drug test right now doesn't help because we don't have consistent drug tests during the case" and it "does not that tell you that they've been negative all year."

## J.     Kedrick Thorn

Kedrick Thorn took over as Eva's caseworker after Gabriel departed.  He exchanged email and text messages with Mother and Father, but he had not been able to meet with them in person or visit with them in their home.  Father did not see the point of a face-to-face meeting and did not allow him to visit their home even after Thorn explained that he needed to visit the home to determine whether it was a safe and appropriate environment for Eva.  Thorn sent Mother and Father to drug testing once a month since August 2024 and neither parent had complied.

During a special hearing held while trial was in recess, the trial court informed Mother that she would be allowed to visit with Eva only if she took a drug test, even if the test result was positive for an illegal substance.  The court instructed the Department to schedule a visitation as soon as possible, but Mother did not take a drug test.  Mother notified the trial court and the parties that she would not take a drug test because she was in litigation with NSC, and she did not know that she had to go to a particular location to test.

Thorn testified that the Department was requesting the trial court to terminate Mother's and Father's parental rights based on Sections 161.001(b)(1)(D), (E), and (O) of the Family Code because Mother and Father had endangered Eva and because neither parent had successfully completed their court-ordered services.  The Department believed that termination of Mother's and Father's parental rights was

in Eva's best interest because although their FSPs required them to maintain sobriety and submit to random drug testing, Mother and Father had tested positive for illegal substances in this case, and neither parent complied with their drug testing requirements. As a result of their failure to submit to drug testing, the Department could not verify whether Mother and Father were still using illegal substances, and it was concerned that Mother and Father would continue to use drugs if Eva was returned to their care because they had tested positive for drugs repeatedly throughout the pendency of the case.

When asked what other services Mother still needed to complete, Thorn testified that Mother had completed her psychological assessment, but not the assessment's recommendations, she had not started working with NPP, she had not completed individual therapy, she failed to provide the Department with proof of medication management, stable housing, and income, and although she had completed a substance abuse assessment, her attendance was inconsistent.

As to Father, Thorn testified that Father completed a psychological evaluation, and substance abuse assessment and although he had attended the recommended number of substance abuse therapy sessions, Father's therapeutic goals were not met, and thus Father did not successfully complete this requirement. Father also tested positive for illegal drugs after he was discharged from substance abuse counseling in February 2024, and although he was required to attend substance

abuse community-based programs such as NA, he had not provided the Department with proof of attendance. Father had also been unsuccessfully discharged from therapeutic services for missing three or more consecutive sessions.

Thorn testified that although Father's FSP required him to provide the Department with a copy of his lease or mortgage agreement, the Department only had a lease agreement from 2023 and Father no longer lived at that address, and he had not provided the Department with documentation of his current address. Although Father's FSP required him to maintain legal employment and provide the Department with a copy of his check stubs, Father had only provided pay stubs at the beginning of the case and thus the Department did not have documentation that Father had maintained employment during the pendency of the case.

Thorn testified that Father had provided gifts to Eva during his weekend visits that were supervised by Charlotte and Brad, but he did not participate in supervised visitation by the Department even though Father knew that it was important for the Department to witness his interactions with Eva. Mother and Father had not shared with him their plans for Eva.

Thorn testified that if the parents' rights were terminated, the Department intended to place Eva for adoption with Brad and Charlotte. He had visited Brad's and Charlotte's home, and he believed that they could provide Eva with the safe and stable environment she needed. Thorn testified that Eva felt safe in Brad's and

Charlotte's home, and they had provided Eva with a loving and nurturing environment and demonstrated they could meet all of Eva's needs. According to Thorn, Eva is happy and has a "great relationship" with Charlotte and Brad, whom she refers to as "Lollipop." Thorn testified that whenever he visits, Brad and Charlotte are always playing with Eva and Eva loves to play with Brad's and Charlotte's dogs. Brad and Charlotte told him that their plan is for Eva to grow up in a safe and loving environment, and they will support her whether she chooses to attend college or follow another career path. The Department believed that Brad and Charlotte would facilitate contact between Eva and Father but only if it was safe and appropriate to do so.

The Department did not believe that Father's request to appoint Brad and Charlotte as Eva's permanent managing conservators and Father as a possessory conservator was in Eva's best interest because of the past hostility between the couples, and the Department did not believe that Mother or Father would submit to drug tests required by any visitation plan because they had failed to complete their services successfully and submit to drug testing. Thorn testified that it also was not in Eva's best interest for Father to be named as Eva's possessory conservator because although he was not aware of any issues between Brad and Father, Mother had a contentious relationship with Brad and Charlotte, and Mother and Father are a

"united front." Thorn testified that Father expressed during the case that he would not visit with Eva unless Mother was present.

## K. Mother

Mother testified that she and Father were running errands with Eva on March 25, 2023. She denied that she and Father left Eva in the car alone while they were inside Ulta for an hour. According to Mother, she left Eva in the car with Father while she shopped, and Father left Eva alone when he walked into the store to give Mother a debit card. The car was idling in the parking lot, with its doors locked, and the air conditioning on.

Mother testified that she realized that Eva was alone in the car when she saw Father in the store, but she did not immediately go to check on Eva because she knew Father "was going to go immediately back" to the car, which was secure and air conditioned, and "we were right there." Mother testified that the store manager had also accused her and Father of shoplifting, detained them, and asked them not to leave. Although Mother gave inconsistent testimony regarding the length of time she was in the store, how long Father was in the store, and how long store employees detained them, Mother testified that Eva had been alone in the car for a maximum of ten minutes.[8] Mother admitted that it was not "a great idea" to leave Eva alone in

---

[8]   She also made conflicting statements with respect to other circumstances, including whether she told the police that she and Father had been detained by store

44

the car for ten minutes and testified that she "didn't choose to leave her there but. . . [she did not] think it's safe."

When asked what she did wrong that day, Mother testified the that she "really didn't see like this huge risk" because Eva was "secure" and "asleep," and Father was "coming in and out." Mother denied endangering Eva because Eva "was not hurt." According to Mother, this was a "one-time event" and her only mistake was not immediately pushing past the Ulta employees.

With respect to the drugs found in the car, Mother testified that she was keeping her pills in Father's pill bottle because her pill bottle was inside her truck, which had recently been stolen. She testified that although she was arrested and charged with possession of a controlled substance—the Xanax found in Father's pill bottle—the case was dismissed. Although Mother denied that a white powdery substance was found inside the car, she also testified that she reviewed the offense report and chemical testing report reflecting that an officer had retrieved a white powdery substance from the car later determined to be fentanyl. When asked why she had fentanyl in her car, Mother denied knowing that the drugs were in the car.

Mother disputed the accuracy of many statements in the removal affidavit and claimed the affidavit omitted important information. Among other things, Mother

employees, and whether the told the police that she walked away because she was having a panic attack.

45

denied telling Department investigator Watson that she used heroin, she left Eva in the car while she shopped at Ulta because she did not want to wake up Eva, or that she walked away from the store when she saw the police because she thought it had "something to do with stealing," and she denied stealing anything from Ulta. She also denied that Father told Watson that he and Mother left Eva with Brad and Charlotte while they "went through detox" or that he did not know why Mother walked off and he had "assumed that [Mother] had a warrant."

Mother acknowledged that twice during trial, the court had ordered her to take a drug test and told her that if she took a drug test through NSC, she would be allowed to visit Eva. Mother testified that she refused to test because she did not trust NSC, and she had a pending lawsuit against them. She testified that if the court had ordered her to test somewhere other than NSC she would have complied with the order. She did not take a private drug test after the trial court offered to reinstate her visitation during trial.

When asked what prevented her from seeing Eva before the court suspended her visits in July 2024, Mother testified that she visited Eva as much as possible before her visitation was suspended. According to Mother, she attended the weekly two-hour visits at the Department's office, and she visited with Eva on the weekends when Charlotte and Brad would allow her to visit. Mother testified that when she and Father visited Eva at the Department's office, they would bring Eva food and

46

play with her and Eva would always get sleepy at the end of the visit when it would be time for Mother and Father to leave. She testified that although she did not get to see Eva very often, Eva would beg her not to leave, and she felt like she had a strong bond with her daughter. Mother testified that she had not given Brad and Charlotte any items for Eva within the previous six months.

Mother did not understand why the Department was involved in her life. When asked if she understood that the Department became involved in her life in part because Eva had been left alone in the car, Mother testified that she "suppose[d] so." She denied that the Department took custody of Eva because Mother and Father violated the safety plan, and the Department was concerned about Mother's and Father's drug use. Mother testified that Brad and Charlotte misled the court about their income and whether they initially wanted to adopt Eva, and she did not believe that Charlotte saw her slumped over in a chair when she was supposed to be watching Eva.

According to Mother, she completed parenting classes, the psychological evaluation and its recommendations, and the substance abuse assessment and its recommendations. Although she initially denied knowing she had been ordered to participate in NPP, she admitted that her attorney attended the status hearing when the court ordered her to attend NPP. She testified that she had successfully completed the FSP's requirement that she participate in substance abuse counseling

because she attended more than fourteen sessions, and no one told her she had been unsuccessfully discharged from counseling.

With respect to the requirement that she provided the Department with proof of employment, income, and a safe and stable home, Mother testified that Father had worked with his current employer for five years, and for the past two years, she and Father had lived in a three-bedroom house with a big backyard and a room for Eva and clothes. Mother, who was unemployed, testified that she did not earn enough from her small furniture renovation business, and she was looking for full-time employment. She testified that she did not need to work because Father earned enough to pay the bills, but she liked to work, and it would make things easier if they had additional income.

When asked about her future plans for Eva, Mother testified that she wanted to be reunified with Eva. If Eva were returned to her care, she would enroll Eva in a daycare near their home and in tumbling classes. She also envisioned Eva going to college.

Mother testified that it was not in Eva's best interest for her rights to be terminated because Eva would miss out on a life with her family, and she did not want Eva to "experience the pain of not having a mother around." Mother testified that if the court terminated her rights or restricted her from visiting with Eva, she

would not interfere with Father's ability to visit Eva, and she would follow any court orders except for an order to test with NSC.

**L.    Father**

Father testified that on March 25, 2023, he and Eva had been waiting in the car while Mother shopped at Ulta, and he got out of the car once to bring Mother his debit card. Father testified that it was a beautiful day and there was no one around the car, and before he left, he "scanned [the] surroundings," made sure the car's windows and doors were locked and the air conditioning was running. According to Father, Ulta employees detained him and Mother because the employees thought they were shoplifting. He was inside the store for only five to ten minutes, and he did not take Eva with him because he planned to run in and give Mother the debit card and immediately return to the car.

When he and Mother walked out of the store, Father noticed that Mother was "like on the verge of having a panic attack" and he told her to "take a stroll to get some fresh air" while he checked on Eva. Father testified that Eva was in "great condition" when he saw her, and she had not suffered any harm from being left alone in the car for a short period of time. He denied that he endangered Eva by leaving her alone in the car because she was not injured. Father agreed, however, that someone could have broken into the car while he was in the store.

49

Father testified that the police asked him about a prescription bottle with his name on it that they found in the car, and he told them that the pills inside belonged to Mother. He denied knowing that police found fentanyl in his car.

Father testified that the Department placed Eva with Brad and Charlotte, and they had arranged for him to visit with Eva on the weekends on several occasions. After the mediated settlement agreement was signed in February 2024, Brad and Charlotte allowed him to have two or three weekend visits with Eva, but they later refused to supervise any additional visits. He did not know why Brad and Charlotte had stopped the weekend visits. He denied that he and Mother were late for several of their weekend visits, and he testified that he was not aware that Mother had been hostile towards Brad and Charlotte, and he did not believe that Brad's and Charlotte's characterization of Mother was accurate.

When Father testified on November 4, 2024, he confirmed that he had not seen Eva for three months because he had had limited contact with Brad and Charlotte. After Father's testimony that day, Brad and Charlotte arranged for Father to visit with Eva that weekend. When he testified again on March 24, 2025, Father stated that he had asked Brad and Charlotte multiple times to allow him to see Eva after they stopped the regular weekend visits, but they only allowed him to visit Eva twice and he could not remember when the last visit occurred.

Father testified he had not been able to attend any weekday visits with Eva at the Department's office because he had a demanding job, and the visits conflicted with his work schedule. Father testified that he had scheduled a visit with Eva on October 30, 2024, but he cancelled the visit when he realized that he would not be able to bring Mother. He confirmed the Department had never suspended his visitation with Eva.

Father acknowledged that he was required to complete the tasks and services outlined in his FSP to be reunified with Eva and he understood that the required services were intended to address the reasons why Eva was removed, but he denied that the Department became involved in this case because of his and Mother's substance abuse. Father testified that he completed his psychological evaluations, substance abuse assessments, individual substance abuse counseling, attended the visits he was allowed to attend, and completed parenting classes, except for NPP. Father, who did not have documentation demonstrating that he had successfully completed substance abuse counseling, testified that no one told him he had been unsuccessfully discharged. He testified that his FSP did not state he was required to complete counseling successfully or provide a certificate; it only required him to attend a specific number of sessions. According to Father, he complied with the individual substance abuse counseling requirement because he attended the number of recommended therapy sessions.

51

Although he acknowledged he had tested positive for several illegal substances since March 2023, including fentanyl, amphetamines, methamphetamines, and hydrocodone, Father disputed the accuracy of the test results and he denied using amphetamines, methamphetamines, fentanyl and hydrocodone after Eva's birth in June 2022. He also denied ever using heroin or seeking treatment for heroin abuse. Father testified he had attended a drug rehabilitation program for suboxone, which is used to treat opioid addictions, and although he had a physical dependence on hydrocodone during his freshman year in college, he had not used hydrocodone since then and he did not recall telling the substance abuse assessor that he had relapsed.

Father testified that Thorn sent him an email or a text message twice a month, but he had stopped testing at NSC because "the results started coming back positive" and he did not trust the accuracy of the testing. Father testified that several of the Department's test results had been negative for fentanyl and all other substances, and he was not challenging the accuracy of those tests. According to Father, the negative test results were accurate, but all the positive test results were inaccurate. Although he stopped drug testing for the Department, he took multiple private drug tests while the case was pending, and he was not concerned about the accuracy of those tests. The last time he took a private drug test was in September 2024.

According to Father, he submitted to drug testing on January 9, 2024, and a portion of the sample was sent to NSC and the other to a laboratory chosen by Father. Father testified that the NSC test was positive for fentanyl, but his private test was negative for fentanyl. The test results of Father's private January 9, 2024 test were admitted into evidence.

Father testified that he had worked for his current employer since 2018 and has an annual salary of $60,000. He lives in the home he bought in July 2023. According to Father, he earns enough money to meet his, Mother's, and Eva's needs, and although it would helpful if Mother worked, it was not necessary.

When asked about his future plans for Eva, Father testified that he plans to enroll Eva in one of the daycare programs near his home as soon as there is availability. Father testified that he wanted to be reunified with Eva and if that was not possible, he wanted the court to appoint him as a possessory conservator and Brad as Eva's permanent managing conservator.

Father expressed concerns about the appropriateness of Brad's and Charlotte's home. According to Father, he was concerned about Brad and Charlotte raising Eva because they were not nurturing and loving towards Eva, they had been hostile or violent towards Mother in front of Eva, they had lied to him, and they allowed Father's mother—Naomi—to watch Eva. Father testified that, when he was a year old, he was injured while in Naomi's care and he did not believe that she should

53

have unsupervised contact with Eva. He also claimed that Charlotte had made sexual advances towards him when he was a young adult, but he admitted he had not mentioned this until trial. Father was also concerned about Brad's ability to care for Eva long-term because Brad was almost seventy years old and although he did not know if Brad had any health problems, Father suspected that Brad might be predisposed to develop dementia.

When asked if he believed that Brad and Charlotte had met all of Eva's basic needs, Father testified he had no way of knowing because he had not had much contact with Brad and Charlotte over the last several months. He admitted, however, that whenever he saw Eva, she appeared to be healthy, and she was dressed appropriately.

Father testified that termination of his parental rights was not in Eva's best interest because if his rights are not terminated, "she would get to be with her family, her mother and father, which is where she belongs," and Mother and Father are young and want to "grow a family." He also testified that if his rights were not terminated and he was appointed as Eva's possessory conservator, he would be required to pay child support and would be able to visit with Eva often. Father testified that if the court required his visits with Eva to be supervised and subject to drug testing, he would comply with those orders because he would not have to test through NSC.

After hearing the parties' closing arguments, the trial court took the case under advisement. On April 21, 2025, the trial court rendered judgment terminating Mother's and Father's parental rights. This appeal followed.

**Summary of Issues**

Mother and Father raise five issues on appeal. In four issues, Mother and Father argue there was legally and factually insufficient evidence to support termination under Sections 161.001(b)(1)(D), (E), or (O), or to support a finding that termination of their parental rights was in the best interest of the child. In a separate issue, Father and Mother argue that the Department's failure to comply with the Indian Child Welfare Act constitutes error. Applying a holistic approach to the evidence of endangerment under Section 161.001(b)(1)(E), we conclude there is legally and factually sufficient evidence from which the trial court could have formed a firm belief or conviction that Mother and Father each engaged in conduct or knowingly placed Eva with persons who engaged in conduct which endangered Eva's physical or emotional well-being. Applying the required deference to the trial court's credibility determinations and findings, there is evidence of Mother's and Father's ongoing substance abuse, including fentanyl and other illegal narcotics, both before Eva came into the Department's care and throughout the pendency of the case, and the impact such use had on Eva's physical and emotional well-being. There is evidence that Mother's and Father's drug-use and behavior resulted in their

55

inability to visit with Eva, resulted in Brad and Charlotte asking Mother and Father to move out of their house given their concerns about drug use and odd behavior, and resulted in the dissolution of the Department's safety plan, which would have allowed Mother and Father to continue living with Eva under Brad and Charlotte's supervision. There is also evidence that fentanyl belonging to Father and pills belonging to Mother were found in the car after the police secured Eva from the car, that Mother and Father refused to acknowledge their ongoing positive test results, that at some point they refused to continue drug testing all together, jeopardizing their ability to visit Eva, and that Mother and Father failed to complete substance abuse counseling successfully.

We also conclude there is legally and factually sufficient evidence from which the trial court could have formed a firm belief or conviction that termination of Mother's and Father's parental rights was in the child's best interest.

And based on the record before us, we conclude the trial court did not err by applying the clear and convincing evidence standard applicable to most parental termination proceedings, as opposed to the ICWA's more stringent standard, because the Department complied with the ICWA's notice requirements and the trial court implicitly found that Eva was not an Indian child.

**Indian Child Welfare Act**

Mother and Father argue that the trial court erred by failing to comply strictly with the requirements of the Indian Child Welfare Act ("ICWA"). According to Mother, the trial court erred by failing to apply the ICWA's heightened procedural and evidentiary burdens to this parental-termination proceeding because the court had "reason to know" that Eva may be an Indian child, as defined by the ICWA, Eva is presumed to be an Indian child unless and until the court determined on the record that she was not an Indian child, and the trial court did not make such a determination prior to trial. Thus, Mother and Father argue, the court was required to proceed under the ICWA.

According to Father, the trial court erred by failing to "provide proper notice to the Cherokee Tribe as required when there is a pending court proceeding seeking termination of the parent-child relationship" and the "failure to strictly comply with ICWA mandatory provisions requires a new trial."

A.  **Applicable Law**

The ICWA is a federal law that applies in state court termination cases when a court knows or has reason to know that an Indian child is involved in a child custody proceeding. *See* 25 U.S.C. § 1912(f); *M.Y. v. Tex. Dep't of Family & Protective Servs.*, 667 S.W.3d 502, 506 (Tex. App.—Austin 2023, no pet.). An "Indian child" is any unmarried person who is under the age of eighteen and is either

(a) a member of an Indian tribe or (b) eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe. 25 U.S.C. § 1903(4); *M.Y.*, 667 S.W.3d at 506.

An Indian tribe for ICWA purposes means any Indian tribe, band, nation, or other organized group or community of Indians recognized as eligible for the services provided to Indians by the Secretary of the Interior because of their status as Indians. 25 U.S.C. § 1903(8). The ICWA does not establish which persons are members of a tribe or eligible for membership in a tribe; that determination lies solely with the tribe itself based on the tribe's internal laws and criteria. *In re S.J.H.*, 594 S.W.3d 682, 687 (Tex. App.—El Paso 2019, no pet.); *In re J.C.C.*, 302 S.W.3d 896, 900 (Tex. App.—Waco 2009, no pet.).

The ICWA provides several procedural and substantive protections in child custody proceedings involving an Indian child, including setting the "minimum requirements with which a state court must comply before terminating parental rights in a case involving an Indian child." *In re R.R. Jr.*, 294 S.W.3d 213, 217 (Tex. App.—Fort Worth 2009, no pet.). An Indian tribe is entitled to notice of a custody proceeding involving an Indian child and has the right to intervene at any stage of the proceedings. The notice must be sent by registered mail with return receipt requested and it must include certain information. 25 U.S.C. § 1912(a). No

termination of parental rights proceeding shall be held until at least ten days after receipt of notice. *Id.*

If a trial court has reason to know that a child is an Indian child, the trial court must "[t]reat the child as an Indian child, unless and until it is determined on the record that the child does not meet the definition of an 'Indian child' in this part." 25 C.F.R. § 23.107(b)(2). The trial court's finding on this point may be either express or implied. *See In re Levi U.*, 78 Cal. App. 4th 191, 199 (2000); *In re E.W.*, 170 Cal. App. 4th 396, 404–05 (2009).

## B. Analysis

During a July 14, 2023 show cause hearing, Mother informed the trial court that she had Cherokee heritage on her grandmother's side. Subsequent permanency reports dated October 2023, January 2024, and June 2024, however, indicate that Father and Mother both "denied" any "possible American Indian status." Notwithstanding, pursuant to the ICWA, on June 7, 2024, the Department sent notices of the pending proceeding to the Cherokee Nation, the Eastern Band of Cherokee Indians, and the United Keetoowah Band of Cherokee Indians in Oklahoma. The notices were delivered on August 2, July 30, and August 5, 2024, respectively. The Department received correspondence from the Cherokee Nation (October 22, 2024) and the Eastern Band of Cherokee Indians' tribal registry (August 8, 2024) stating that Eva was not determined to be an Indian Child as

defined by the ICWA. The United Keetoowah Band of Cherokee Indians in Oklahoma did not respond to the Department's notice or otherwise intervene in the proceedings.

Trial began on September 11, 2024—three months after the ICWA notices were sent—and it ended on April 2, 2025. On April 3, 2025, the trial court rendered judgment terminating Mother's and Father's parental rights, without making an express finding concerning Eva's status under the ICWA. Mother filed a timely motion for new trial arguing that the trial court had not complied with the ICWA.[9] During the hearing on the motion for new trial on June 4, 2025, the Department argued that the trial court had not erred by applying the clear and convincing evidence standard applicable to most parental termination proceedings, as opposed to the more stringent standard under the ICWA, because the tribes were timely notified of the proceedings, no tribe had indicated that Eva was an Indian child or chosen to intervene, and at least two of the tribes had determined that Eva was not considered an Indian child under their standards.[10] According to the Department, "[i]f the tribe had responded in the affirmative, then we would have been bound by the ICWA standards; however, they have denied this child being of—an Indian child

---

[9] Father filed an identical motion for new trial and although his counsel attended the hearing on the motion for new trial, his counsel did not present any arguments.

[10] The ICWA notices the Department sent to the tribes were filed in the trial court on June 10, 2025, and the tribes' responses and return receipts for all three tribes were filed on June 3, 2025, the day before the hearing on the motion for new trial.

as determined by statute." The Department and the attorney at litem argued that even if the trial court had erred by not making a finding prior to trial as to whether the ICWA applied, a new trial was not necessary because the trial court could make a finding at the motion for new trial stage. The trial court took the motion under advisement, and on June 4, 2025, it issued an order denying Mother's motion for new trial.[11]

The record reflects that (1) the Department sent the required ICWA notices to the Cherokee Nation, the Eastern Band of Cherokee Indians, and the United Keetoowah Band of Cherokee Indians in Oklahoma by certified mail return receipt requested, as required, (2) the notices contained the information required by 25 C.F.R. § 23.111(d),[12] (3) trial commenced more than ten days after the tribes received the notices, (4) no tribe intervened in the proceeding and two tribes expressly disclaimed that Eva was an Indian child. Although the trial court did not make an express finding prior to trial as to whether Eva was an Indian child, the transcript of the hearing on the motion for new trial reflects that the trial court considered this issue and the trial court implicitly found that Eva was not an Indian child, as defined by the ICWA, when it denied Mother's motion for new trial. *See*

---

[11]  There is no order ruling on Father's motion for new trial, and thus the motion was overruled by operation of law.

[12]  Mother and Father do not dispute that the notices included the required information.

*In re Levi U.*, 78 Cal. App. 4th at 199 (holding determination of applicability of ICWA can be either express or implied).

Given the record before us—including an extensive discussion between the parties and the trial court concerning this issue during the hearing on the motion for new trial, and the filed ICWA notices, return receipts and tribe responses—we conclude the trial court considered the issue and implicitly denied the application of the ICWA. *See In re E.W.*, 170 Cal. App. 4th at 404–05 (stating implicit finding sufficient "at least as long as the reviewing court can be confident that the [trial] court considered the issue and there is no question but that an explicit ruling would conform to the implicit one").

Mother argues there is no competent evidence demonstrating the Department complied with the ICWA notice requirements because the ICWA notices, tribe responses, and return receipts were not admitted into evidence at trial, the evidentiary record was closed at judgment, and the Department cannot cure its evidentiary failure by supplementing the record post-judgment. The ICWA does not require that evidence of a notice be formally admitted at trial or during an evidentiary hearing. We further note that appellate courts have abated termination appeals and remanded the cases to the trial court to allow the department and the trial court to comply with ICWA's notice requirements and determine whether a child is an Indian child under the ICWA. *See In re E.S.S.*, No. 05-23-00031-CV, 2023 WL 4782682,

at *15–16 (Tex. App.—Dallas July 27, 2023, pet. denied) (mem. op.); *In re J.J.C.*, 302 S.W.3d at 902; *In re R.R., Jr.*, 294 S.W.3d at 237–38.[13]  Courts thus have allowed trial courts to comply with ICWA requirements post-judgment and relied on those post-judgment proceedings to demonstrate compliance with ICWA.

Here, we need not abate or remand, because the ICWA notices were sent as required under the ICWA, the trial court considered the application of the ICWA during the motion for new trial hearing, and by denying the motion for new trial, it implicitly denied the application of the ICWA.  *See In re E.W.*, 170 Cal. App. 4th at 404–05 (stating implicit finding was sufficient if "the [trial] court considered the issue and there is no question but that an explicit ruling would conform to the implicit one").

Based on the record before us, we conclude the trial court did not err by applying the clear and convincing evidence standard applicable to most parental termination proceedings, as opposed to the ICWA's more stringent standard, because there is evidence in the trial court record reflecting that the Department complied with the ICWA's notice requirements, and the trial court implicitly found that Eva was not an Indian child.

---

[13]     The requirements that the trial courts hold evidentiary hearings are requirements imposed by the appellate courts.

We overrule Mother's and Father's challenges to the decree of termination based on the ICWA.

**Evidentiary Issues**

Father argues that the trial court abused its discretion by overruling Father's hearsay objection to the admissibility of his drug test results (Petitioner's Exhibit 35) arguing "there is no business record affidavit on file allowing for the admissibly of these records." Father argues that "[a]lthough [the Department] claims the drug test results were filed with affidavits, the court noted this does not make the affidavits part of the exhibit or evidence."

Mother argues that the trial court abused its discretion by admitting Petitioner's Exhibits 30 (drug chemistry report), 34 (Mother's drug test results), 35 (Father's drug test results), 36 (Mother's closure summary report for individual substance abuse counseling), 37 (Father's closure summary report for individual counseling), 38 (Father's closure summary report for individual substance abuse counseling), and 43 (Mother's private drug test results) because no business records affidavit was attached to the records submitted into evidence at trial, and thus none of the exhibits had been properly authenticated.

## A. Standard of Review and Applicable Law

We review a trial court's rulings admitting or excluding evidence for an abuse of discretion. *A.B. v. Tex. Dep't of Family & Protective Servs.*, No. 03-17-00658-

CV, 2018 WL 1220894 at *3 (Tex. App.—Austin Mar. 9, 2018, no pet.) (mem. op.) (citing *In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005)). "A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner 'without reference to any guiding rules or principles.'" *Id.* (quoting *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985)). We will uphold the trial court's ruling if there is any legitimate basis for the ruling. *In re G.B.*, No. 06-20-00031-CV, 2020 WL 4589761, at *3 (Tex. App.—Texarkana Aug. 11, 2020, no pet.) (mem. op.).

Texas Rule of Evidence 803(6) allows, as an exception to the rule against hearsay, the admission of records kept in the course of regularly conducted business activities. TEX. R. EVID. 803(6); *see In re K.C.P.*, 142 S.W.3d 574, 578 (Tex. App.—Texarkana 2004, no pet.). The proponent must prove that the document was made at or near the time of the events recorded, from information transmitted by a person with knowledge of the events, and made or kept in the course of a regularly conducted business activity, unless the opponent demonstrates the source of information or the method or circumstances of preparation indicate a lack of trustworthiness. TEX. R. EVID. 803(6); *see In re K.C.P.*, 142 S.W.3d at 578. The predicate for admission of a business record may be established by an affidavit that complies with Texas Rule of Evidence 902(10). TEX. R. EVID. 803(6)(d); *In re K.C.P.*, 142 S.W.3d at 578; TEX. R. EVID. 902(10).

A party must object each time the inadmissible evidence is offered or make a running objection. *Valle v. State*, 109 S.W.3d 500, 509 (Tex. Crim. App. 2003). To preserve error for appeal, the party must have made a timely, specific objection at the earliest possible opportunity. *Tryco Enters., Inc. v. Robinson*, 390 S.W.3d 497, 505 (Tex. App.—Houston [1st Dist.] 2012, pet. dism'd).

## B. Mother's Drug Test Results and Father's Drug Test Results

When Mother's drug test results and Father's drug test results were first offered into evidence as Petitioner's Exhibits 34 and 35, Father objected that the records were hearsay, and they had not been authenticated because there were no business record affidavits attached to the exhibits and the Department had not established chain of custody. Mother joined Father's objections. The Department and attorney ad litem argued that the records were admissible under the business records exception to hearsay because the records and accompanying business record affidavits had been filed in the trial court and produced to the attorneys more than fourteen days before trial and it was not necessary to attach the affidavits to the evidence offered at trial to authenticate the records. [14] The trial court overruled the objections.

---

[14] Although Mother and Father objected to the admission of their drug test results on the ground that the Department had not established chain of custody, chain of custody goes to the weight of the evidence and not its admissibility. *See Powers v. Tex. Mut. Ins. Co.*, No. 11-08-00088-CV, 2010 WL 337144, at *4 (Tex. App.—Eastland Jan. 29, 2010, pet. denied) (mem. op.) ("Texas civil and criminal cases

Later during trial, Father objected to Gabriel's reading the results of Mother's drug tests into the record because there was no business record affidavit attached to the records, "there is no chain of custody to authenticate" the drug test results, and Gabriel was "not qualified to read what the drug tests mean." The trial court overruled the objections.

Under Texas Rule of Appellate Procedure 902(10), a business record is self-authenticating if the record meets the requirements of Rule 803(6), the record is accompanied by an affidavit that complies with Rule 902(10)(B), and the record and accompanying affidavit are served "on each other party to the case at least 14 days before trial." TEX. R. EVID. 902(10)(A). The rule does not require that the affidavit be admitted into evidence along with the business record for the record to be self-authenticating. *See In re N.C.M.*, 66 S.W.3d 417, 419 (Tex. App.—Tyler 2001, no pet.) ("The plain language of Rule 902(10)(a) does not require that the affidavit be attached to a business record when the exhibit is offered into evidence.").[15] Neither

_____

hold that, to the extent that there are any gaps in the chain of custody, they go to the weight of the evidence rather than to its admissibility."). Furthermore, neither Mother nor Father argues on appeal that the trial court erred in overruling their chain of custody objection.

[15] Father relies on *Freeman v. American Motorist Inc*., 53 S.W.3d 710 (Tex. App.—Houston [1st Dist.] 2001, no pet.) and *Brooks v. Housing Auth*., 926 S.W.2d 316 (Tex. App.—El Paso1996, no writ) but neither supports his position.

The issue in *Freeman* was the admissibility of a letter from a doctor as a business record. 53 S.W.3d at 714. The court concluded that the letter was not admissible as a business record because the letter did not qualify as a routine entry by the doctor

Mother nor Father dispute that they were properly served with copies of the business records and their accompanying affidavits at least fourteen days before trial, nor do they argue that any of the affidavits fail to comply with the requirements of Rule 902(10)(B). *See* TEX. R. EVID. 902(10)(A)–(B). Neither Mother nor Father disputed in the trial court that the drug test results qualified as business records under Rule 803(6). *See* TEX. R. EVID. 803(6). The trial court thus did not abuse its discretion by overruling Mother's and Father's hearsay and lack of authentication objections to the admission of their drug tests results.

Mother also argues on appeal that the lack of business records affidavits "render the drug test results and service provider records as inadmissible hearsay that required exclusion" because the "effect of [the Department's] failure to put the affidavits in the record is that there was no evidence offered to verify the reliability or trustworthiness of the results." Mother did not object to admission of any drug test results or "service provider records" based on insufficient indicia of reliability or trustworthiness, and she thus failed to preserve this argument for appeal. *See Benson v. Chalk*, 536 S.W.3d 886, 895 (Tex. App.—Houston [1st Dist.] 2017, pet.

---

in the patient's medical history. *See id.* at 715. And in *Brooks*, the appellant argued the trial court abused its discretion by admitting service reports as business records because the reports "were not backed by Affidavits as per Rule of Evidence 902(10)," and thus had not been authenticated. 926 S.W.2d at 322. The court held that the trial court had not abused its discretion by overruling the objection because a witness had testified in person concerning the business records, and thus an affidavit was not necessary to authenticate the records. *See id.*

denied) (stating complaint on appeal must comport with objection in trial court); *In re C.K.H.*, No. 01-22-00603-CV, 2023 WL 2026550, at *15 (Tex. App.—Houston [1st Dist.] Feb. 15, 2023, pet. denied) (mem. op.) ("Mother's complaints on appeal must comport with her complaints in the trial court; otherwise, they present nothing for appellate review."); *see also* TEX. R. APP. P. 33.1(a).

Furthermore, although Mother joined Father's objections to the admission of her drug test results and Father's drug test results on grounds of lack of authentication and hearsay, unlike Father, Mother did not reassert her objections when Gabriel testified about the results of Mother's and Father's drug tests. *See In re M.S.*, No. 02-20-00147-CV, 2020 WL 6066400, at *5 (Tex. App.—Fort Worth Oct. 15, 2020, no pet.) (mem. op.) (stating "any error in admitting evidence is deemed harmless and is waived if the objecting party later permits the same or similar evidence to be introduced without objection"). Mother thus waived her objections to the admission of the admission of her drug test results and Father's drug test results.

We conclude the trial court did not abuse its discretion by admitting Mother's and Father's drug test results into evidence.

C. **Drug Chemistry Report and Closure Summary Reports**

Mother argues that the trial court also abused its discretion by admitting Petitioner's Exhibits 30, 36, 37, and 38 because no business-records affidavit was

attached to the records submitted into evidence at trial, and thus none of the exhibits had been properly authenticated.

Exhibit 30 is a drug chemistry report containing the results of forensic testing performed on the white, rock-like substance Deputy Zapata recovered from Mother and Father's car. Contrary to Mother's assertion on appeal, the drug chemistry report was offered into evidence with an attached business records affidavit. Mother did not object to the admission of the report based on improper authentication and thus she has not preserved this issue for appellate review. *See Benson*, 536 S.W.3d at 895; *In re C.K.H.*, 2023 WL 2026550, at *15. Furthermore, Mother testified, without objection, that she reviewed the offense report which stated that law enforcement had retrieved a white substance from the car that was submitted for testing, and the drug chemistry report (PX-30) indicated that the substance recovered from the car was fentanyl. *See In re M.S.*, 2020 WL 6066400, at *5 (stating error in admission of evidence "deemed harmless and is waived" when same or similar evidence is introduced without objection).

Exhibit 36 is Mother's closure summary report for individual substance abuse counseling, Exhibit 37 is Father's closure summary report for individual counseling, and Exhibit 38 is Father's closure summary report for individual substance abuse counseling. Mother did not object when Gabriel and Nava testified about the contents of Father's closure summary report for individual counseling. *See id.*

When Mother was questioned about Exhibit 36, Mother only objected based on hearsay. Mother's argument on appeal, however, is that the trial court erred in admitting Exhibit 36 into evidence because no business records affidavit was attached to the exhibit itself. Mother's argument is waived because she did not object to the admission of the evidence on this basis when she testified about it at trial, and her general hearsay objection did not preserve an objection to the admission of the exhibit based on lack of an attached business record affidavit. *See id.*; *see also Foster v. Nat'l Collegiate Student Loan Tr. 2007-4*, No. 01-17-00253-CV, 2018 WL 1095760, at *6 (Tex. App.—Houston [1st Dist.] Mar. 1, 2018, no pet.) (mem. op.) (holding general hearsay objection did not preserve for appeal challenge to predicate being made to admit business records). Mother did not object to the admission of Exhibit 38 on any grounds. She thus preserved nothing for our review with regard to this exhibit. *See* TEX. R. APP. P. 33.1(a).

We thus overrule Mother's challenges to the admission of Petitioner's Exhibits 30, 36, 37, and 38 because Mother either waived or failed to preserve the issue for appellate review.

## D.    Mother's Private Drug Test Results

Mother argues the trial court abused its discretion by admitting the results of the drug tests she obtained through a private laboratory (Petitioner's Exhibit 43) because a business records affidavit was not attached to the exhibit, the records are

71

privileged under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and the Department did not give Mother notice of its intent to subpoena her medical records as required by HIPAA.[16] According to Mother, the Department "did not show that its subpoena complied with 45 C.F.R. § 164.512(e)(1), making Ex. 43 protected health information illegally obtained and inadmissible." A business records affidavit was included with Exhibit 43 and Mother did not argue that the affidavit did not comply with the requirements of Texas Rule of Evidence 902(10)(b) or was otherwise insufficient to authenticate the drug test results.

"In civil cases, even illegally obtained evidence may be admissible at trial." *In re Strategic Impact Corp.*, 214 S.W.3d 484, 488 (Tex. App.—Houston [14th Dist.] 2006, no pet.); *see also Collins v. Collins*, 904 S.W.2d 792, 799 (Tex. App.—Houston [1st Dist.] 1995), writ denied, 923 S.W.2d 569 (Tex. 1996) ("Illegally obtained evidence has been held admissible in civil lawsuits."). Generally, all relevant evidence that is not privileged is discoverable. *See* TEX. R. CIV. P. 192.3. Mother has not directed us to, nor have we found, any authority holding that evidence obtained in violation of 45 C.F.R. § 164.512(e)(1) is per se inadmissible. *See generally In re Jarvis*, 431 S.W.3d 129, 135 (Tex. App.—Houston [14th Dist.] 2013, no pet.) ("The HIPAA provisions do not create a privilege against production

---

[16]    On appeal, Father incorrectly stated that Petitioner's Exhibit 43 is Father's drug test results from the private facility. The only record of Father's private drug test results is a January 9, 2024 drug test that was admitted into evidence as Father's Exhibit 1.

72

or admission of evidence; they merely create a procedure for obtaining protected medical records in litigation."). We thus cannot say that the trial court abused its discretion by overruling Mother's objection to the admission of Exhibit 43.

### Termination of Parental Rights

A parent's rights to the "companionship, care, custody, and management" of his or her child is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982) (quoting *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 27 (1981)); *see In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). The United States Supreme Court has emphasized that "the interest of [a] parent[ ] in the care, custody, and control of [her] children . . . is perhaps the oldest of the fundamental liberty interests recognized by th[e] Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). Likewise, the Texas Supreme Court has concluded that "[t]his natural parental right" is "essential," "a basic civil right of man," and "far more precious than property rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (internal quotations omitted); *see also In re R.J.G.*, 681 S.W.3d 370, 373 (Tex. 2023) ("Both this Court and the Supreme Court of the United States have long recognized the fundamental right of parents to make decisions concerning the care, custody, and control of their children."). Consequently, we strictly scrutinize termination proceedings and strictly construe the involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20.

73

A court may terminate the parent-child relationship under Section 161.001 of the Family Code if the Department establishes, by clear and convincing evidence, that (1) the parent has engaged in one or more of the enumerated predicate acts or omissions under Section 161.001(b)(1), and (2) termination is in the best interest of the child. *See* TEX. FAM. CODE § 161.001(b). "Both elements must be established, and termination may not be based solely on the best interest of the children as determined by the trier of fact." *In re M.A.J.*, 612 S.W.3d 398, 406 (Tex. App.—Houston [1st Dist.] 2020, pet denied). Only one predicate finding under Section 161.001(b)(1) "is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007. When reviewing the legal sufficiency of the evidence in a case involving termination of parental rights, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that there existed grounds for termination under Section 161.001(b)(1) and that termination was in the best interest of the child. *See id.* § 161.001(b)(1), (2); *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).

We look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018) (citing *In re J.F.C.*, 96 S.W.3d at 266); *see also In re J.O.A.*, 283 S.W.3d 336, 344–45 (Tex. 2009). We assume the "factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *In re J.F.C.*, 96 S.W.3d at 266; *see also In re A.C.*, 560 S.W.3d at 630–31. We must disregard all evidence that a reasonable factfinder could have disbelieved or found not to be credible. *In re J.F.C.*, 96 S.W.3d at 266. But this does not mean we must disregard all evidence that does not support the finding. *Id.* Because of the heightened standard in termination cases, we must also be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.* If we determine that no reasonable trier of fact could form a firm belief or conviction that the matter that must be proven is true, we must hold the evidence to be legally insufficient and render judgment in favor of the parent. *Id.*

When conducting a factual sufficiency review in a termination case, we must consider the entire record. *In re A.C.*, 560 S.W.3d at 631; *In re J.F.C.*, 96 S.W.3d at 266. Unlike in a legal sufficiency review, when assessing the factual sufficiency of the evidence we cannot disregard disputed evidence that a reasonable factfinder could not have credited in favor of the finding. *In re J.F.C.*, 96 S.W.3d at 266; *see*

*also In re A.C.*, 560 S.W.3d at 630 ("The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered."). "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.* at 631 (citing *In re J.F.C.*, 96 S.W.3d at 266).

Under both legal and factual sufficiency standards, the trial court is the "the sole arbiter of the witnesses' credibility and demeanor." *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021) (quoting *In re J.O.A.*, 283 S.W.3d at 346). As the sole factfinder in a bench trial, it is the trial court's province to weigh the evidence and resolve any evidentiary conflicts. *See In re R.J.*, 579 S.W.3d 97, 117 (Tex. App.—Houston [1st Dist.] 2019, pet. denied). Because of the fact-intensive nature of reviewing parental termination cases, appellate courts afford great deference to the factfinder on issues of credibility and demeanor because the factfinder "faced the parties and their witnesses, observed their demeanor, and had the opportunity to evaluate the claims made by each parent." *In re J.J.G.*, 540 S.W.3d at 56 (quoting *In re J.R.D.*, 169 S.W.3d 740, 743 (Tex. App.—Austin 2005, pet. denied)); *see also In re R.R.A.*, 687 S.W.3d 269, 279 n.50 (Tex. 2024) ("Reviewing courts . . . must defer to the factfinder's judgment as to the credibility of the witnesses and the weight

to give their testimony, including reasonable and logical inferences from the evidence."). Although "the trier of fact may draw inferences," those inferences must be "reasonable and logical ones." *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020) (quoting *In re E.N.C.*, 384 S.W.3d 796, 804 (Tex. 2012)).

## Predicate Findings

Mother and Father argue there is legally and factually insufficient evidence supporting the trial court's findings that they committed the predicate acts under Section 161.001(b)(1)(D), (E), and (O) of the Family Code.

### A. Endangerment Findings Under Subsection 161.001(b)(1)(E)

Section 161.001(b)(1)(E) authorizes the termination of a parent's rights to a child when the parent has endangered the child's physical or emotional well-being. The term "endanger" as used in Section 161.001(b)(1)(E) encompasses a broad "array of conduct that 'expose[s a child] to loss or injury' or 'jeopardize[s]' the child." *In re R.R.A.*, 687 S.W.3d at 277 (quoting *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)); *see also In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (stating parent's conduct which subjects child to life of uncertainty and instability endangers child's physical and emotional well-being). "[E]ndangering conduct is not limited to actions directed towards the child." *In re J.O.A.*, 283 S.W.3d at 345; *see also In re T.G.R.-M.*, 404 S.W.3d 7, 13 (Tex. App.—Houston [1st Dist.] 2013, no pet.). The danger to the

77

child may be inferred from parental misconduct, even if the conduct is not directed at the child and the child suffered no actual injury. *See Boyd*, 727 S.W.2d at 533 (stating although endanger means "more than a threat of metaphysical injury or the possible ill effects," "it is not necessary that the conduct be directed at the child or that the child actually suffers injury").

Evidence of a parent's illegal drug use may support a finding of endangerment under Subsection (E). *See In re J.O.A.*, 283 S.W.3d at 345; *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (stating evidence of parent's use of illegal drugs may support finding of endangerment under Subsection (E) because illegal drug use "exposes the child to the possibility that the parent may be impaired or imprisoned"). In *In re R.R.A.* the Supreme Court of Texas clarified the connection between a parent's illegal drug use and endangerment of a child. The court confirmed that endangerment does not require a parent's drug use to directly harm the child. Instead, "a pattern of parental behavior that presents a substantial risk of harm to the child permits a factfinder to reasonably find endangerment." *In re R.R.A.*, 687 S.W.3d at 278. It explained:

> While illegal drug use alone may not be sufficient to show endangerment, a pattern of drug use accompanied by circumstances that indicate related dangers to the child can establish a substantial *risk* of harm. A reviewing court should not evaluate drug-use evidence in isolation; rather, it should consider additional evidence that a factfinder

could reasonably credit that demonstrates that illegal drug use presents a risk to the parent's "ability to parent."

*Id.* (quoting *In re J.O.A.*, 283 S.W.3d at 345) (emphasis in original); *see also In re A.V.*, 697 S.W.3d 657, 659 (Tex. 2024) (stating *In re R.R.A.* requires "holistic endangerment review"). For example, "[w]hen a pattern of drug use is coupled with credible evidence of attendant risks to employment, housing, and prolonged absence from the children, a factfinder reasonably can find endangerment to the child's physical or emotional well-being under (D) and (E)." *In re R.R.A.*, 687 S.W.3d at 281; *see id.* ("Father's positive drug tests in 2020 and across-the-board refusal to undergo service-plan tests from November 2020 to September 2021 sufficiently develop Father's continued pattern of drug use."). The court held in *In re R.R.A.* that the lower court "should not have ignored the aggregate weight of Father's ongoing drug use, homelessness, employment instability, and near-complete abandonment of his children for the six months preceding trial," and the court "reasonably could have inferred that this conduct, in the aggregate, endangered the children's physical and emotional well-being." *Id.*

Under Section 161.001(b)(1)(E), a parent's rights may be terminated if clear and convincing evidence establishes the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(E). Unlike Subsection (D), termination under Subsection (E) focuses on the parent's conduct

79

and requires "more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required." *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Thus, the relevant inquiry under Section 161.001(b)(1)(E) is whether there is evidence the parent engaged in a course of conduct that endangered the child's physical or emotional well-being. *Jordan v. Dossey*, 325 S.W.3d 700, 723 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

## B. Mother: Endangerment Under Subsection 161.001(b)(1)(E)

In her third issue, Mother argues there is legally and factually insufficient evidence that she endangered Eva by engaging in conduct or knowingly placing Eva with persons who engaged in conduct that endangered Eva's physical or emotional well-being because (1) Mother did not leave Eva alone in the car—she left Eva with Father, (2) there is no evidence Mother "deliberately chose to leave [Eva in the car alone] or intended to keep [Eva] in the car after she learned of it," (3) there is no evidence connecting Mother to the fentanyl found in the car, (4) although she was arrested and charged with possession of a controlled substance found in the car (Xanax), the charge was dismissed when she demonstrated that she had a prescription for the medication, and (5) there is no admissible evidence that she used illegal drugs. *See* TEX. FAM. CODE § 161.001(b)(1)(E).

As previously discussed, Mother's drug test results were properly admitted. The results of the drug tests Mother took through the Department reflect that during

the two years the case had been open, Mother tested positive for fentanyl (ten times), norfentanyl (three times), methamphetamine (two times), cocaine or cocaine metabolites (two times), amphetamines (nine times), and marijuana (two times). Mother's private drug testing results from LabCorp, also reflect that her November 6, 2023 hair follicle tested positive for fentanyl and that her December 20, 2023 hair follicle tested positive for fentanyl and norfentanyl. Mother also failed to appear for multiple drug tests throughout the pendency of the case, and she refused to take any drug tests after March 2024. Mother also refused to submit to drug tests despite being ordered to do so by the court, and while knowing that each failure to test could be considered a positive result. *See In re J.M.T.*, 519 S.W.3d 258, 269 (Tex. App.— Houston [1st Dist.] 2017, pet. denied) (stating refusal to provide hair sample permitted court to infer parent refused testing because it would be positive); *In re C.A.B.*, 289 S.W.3d 874, 885 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (same). This evidence demonstrates that Mother repeatedly tested positive for multiple illegal drugs while Eva was in the Department's care, despite knowing that her parental rights were at stake and that she was required to stop using drugs before Eva could be returned to her care, and thus supports the trial court's endangerment finding under Subsection (E). *See In re K.A.C.*, 594 S.W.3d 364, 373 (Tex. App.— El Paso 2019, no pet.) ("[E]vidence that the parent continued to use illegal drugs even though the parent knew her parental rights were in jeopardy is conduct showing

81

a voluntary, deliberate, and conscious course of conduct, which by its nature, endangers a child's well-being."); *see also In re R.R.A.*, 687 S.W.3d at 281 (recognizing parent's "positive drug tests in 2020 and across-the-board refusal to undergo service-plan tests from November 2020 to September 2021 sufficiently develop[ed] [his] continued pattern of drug use"); *In re M.T.W.*, 01-11-00162-CV, 2011 WL 6938542, at *13 (Tex. App.—Houston [1st Dist.] Dec. 29, 2011, no pet.) (mem. op.) ("A parent's engaging in illegal drug activity after agreeing not to do so in a service plan for reunification with [his] children is sufficient to establish clear and convincing proof of voluntary, deliberate, and conscious conduct that endangered the well-being of [his child].") (quotation omitted).

In addition to Mother's drug test results, there is other evidence in the record demonstrating that Mother used illegal drugs before and after Eva was taken into the Department's care, including Mother's own admissions of illegal drug use. Mother told Watson that she had used marijuana and heroin in the past, she usually used heroin on the weekends, and the last time she used heroin was the day before Eva was left alone in the car. Mother also told Watson that she used drugs in the car when Eva was not around and, according to Watson, Mother and Father "willingly admitted to using heroin and abusing pills while actively caring for [Eva] and stated they recently used [on March 24, 2023,] two days prior to the intake coming in."

Mother reported that she had last used cocaine on March 18, 2023—one week before Eva was found alone in the car, the last time she used marijuana was in March 2023, she started using fentanyl in powder form "last year [2022]," she snorted a line of fentanyl once a month on the weekends, and the last time she used fentanyl was in May 2023. She denied that she and Father had ever used fentanyl in their home and instead, they would "take turns going out and having fun, or, they would have someone babysit so they could both go out."

Prior to Eva's removal, the Department developed a safety plan for Eva that required Mother, Father, and Eva to live with Brad and Charlotte, who had agreed to be Mother's and Father's safety monitors. When asked if there were any issues with the safety plan, Brad testified that Mother was incoherent sometimes, spoke nonsensically, and she did not see "rational." Mother also seemed a "little loopy" in the evenings and she would "hold [Eva] kind of wildly or not considered safe." Brad testified that he was also concerned when Mother and Father went to their apartment one night and they were "sluggish" when they returned to Brad's home at 1 a.m.

Charlotte also testified that Mother, who was responsible for caring for Eva, appeared intoxicated when she lived with them days after the car incident in the parking lot. According to Charlotte, Mother would be "unsteady, unbalanced, sluggish, sleepy, and then in a few hours, she would be very happy and joyful." One day Mother "acted really confused" and she "was kind of all over the place" and

83

"[m]aybe a little manic." She was concerned for Eva's safety when she saw Mother sitting in a chair "with her head cocked back, eyes wide open while [Eva] was climbing on her." Charlotte testified that most evenings Mother and Father would leave Eva with them and go "do something at their house" and they would return much later than they said they would return. Father told Charlotte they needed to stay with Eva because he and Mother had been using drugs and they "needed to get clean." Father also told the Department that he and Mother were detoxing while they were living with Brad and Charlotte and Eva. Mother and Father moved out when Brad and Charlotte informed the Department that Mother and Father were "still participat[ing] in active drug use" and they did not want them in their home. Mother also admitted that she had tested positive for cocaine and marijuana while living with Charlotte and Brad.

Although Mother repeatedly denied using illegal drugs—disputing the accuracy of the drug test results, the testimony of multiple witnesses on this point, the statements contained in the removal affidavit, her psychological evaluation, and her substance abuse assessment—the trial court, as the sole factfinder, could have credited the positive drug test results and witness testimony regarding Mother's illegal drug use and testing record over Mother's testimony to the contrary. *See In re J.P.B.*, 180 S.W.3d at 574 (noting it is within factfinder's province to judge parent's demeanor and to disbelieve parent's testimony); *In re S.C.F.*, 522 S.W.3d

693, 703 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (holding trial court sitting as factfinder could credit lab reports and witness testimony over father's denial of drug use and his claim that positive drug test result was false).

There is also evidence from which the trial court could have reasonably inferred that Mother's pattern of ongoing illegal drug use adversely affected her ability to parent, thus presenting a substantial risk to Eva's physical or emotional well-being. *See In re R.R.A.*, 687 S.W.3d at 278 (explaining that parent's use of narcotics and its effect on his or her ability to parent may qualify as endangering course of conduct). Although Mother denied that she used drugs around Eva or that she and Father had ever used fentanyl in the home, the trial court could have disbelieved Mother's testimony and credited Mother's statement to Watson that she and Father had used "heroin and [were] abusing pills while actively []caring for [Eva]," and Charlotte's testimony that Mother was intoxicated when she cared for Eva at her home. *See Jordan*, 325 S.W.3d at 713 (stating "[w]hen there is conflicting evidence [in a parental termination case], it is the province of the trier of fact to resolve such conflicts").

The trial court also could have reasonably inferred from the evidence that Mother was intoxicated when Charlotte saw Eva crawling on Mother, thus placing ten-month-old Eva's physical safety at risk. *See In re R.R.A.*, 687 S.W.3d at 279 n.50 ("Reviewing courts . . . must defer to the factfinder's judgment as to the

credibility of the witnesses and the weight to give their testimony, including reasonable and logical inferences from the evidence.").

Furthermore, Brad testified that he and Charlotte stopped supervising visits between Eva and Mother and Father in June or July 2024 in part because Mother and Father had stopped drug testing and were not completing their services. According to Brad, he and Charlotte did not "know [Mother's or Father's] state of mind" or "what's going on," and they did not want to "take that chance" with Eva. After a hearing on July 23, 2024, the trial court ordered Mother to take a drug test and suspended her visits with Eva until she could provide a negative drug test and act civilly during visits. Not only did Mother fail to comply with the trial court's order for drug testing, she also rejected the trial court's subsequent offers during trial on November 4, 2024 and in March 2025 to bring NSC to the courthouse to administer a drug test to Mother so that her visitation with Eva could be immediately reinstated. As a result of Mother's refusals to submit to drug testing, Mother's visitation was never reinstated, and she had not seen Eva for nine months prior to April 2, 2025— the last day of trial.

The trial court could have reasonably inferred from this evidence that Mother prioritized her drug usage over being able to maintain her parental relationship with her young daughter and Mother's willingness and ability to parent Eva was adversely affected by her pattern of ongoing illegal drug use because it prevented Mother from

86

visiting with Eva from July 2024 until the conclusion of trial on April 2, 2025. *See In re R.R.A.*, 687 S.W.3d at 278 (stating endangerment analysis includes assessment of whether parent's "illegal drug use present[ed] a risk to the parent's 'ability to parent'"); *see also In re J.G.*, No. 02-21-00257-CV, 2022 WL 187983, at *9 (Tex. App.—Fort Worth Jan. 20, 2022, no pet.) (mem. op.) (stating parent's failure to visit can endanger child's emotional well-being and supports finding of endangerment under Subsection (E)).

After Mother and Father moved out of Brad and Charlotte's home, Brad and Charlotte agreed to supervise weekend visits between Mother, Father, and Eva. Brad and Charlotte testified that Mother was combative and aggressive towards Charlotte during these visits, which became more "hostile" after February 2024. Brad testified that he and Charlotte stopped supervising visits between Eva and Mother and Father because they were concerned for Charlotte's safety, and Charlotte was worried about the impact witnessing these encounters had on Eva. *See In re N.T.*, No. 02-24-00067-CV, 2024 WL 2066375, at *5 (Tex. App.—Fort Worth May 9, 2024, no pet.) (mem. op.) (holding evidence parent was "very aggressive," "hostile," "combative," and "belligerent" towards Department investigators, caseworkers, and guardian ad litem and parent had exhibited such behavior in child's presence supported endangerment finding under Subsection (E)).

87

Mother's decision to leave Eva in the car alone together with evidence she had used drugs the day before and that the pills found in the car were hers also supports the trial court's finding that Mother engaged in conduct or knowingly placed Eva with persons who engaged in conduct that endangered Eva's physical or emotional well-being. While there is conflicting evidence regarding the circumstances in which Eva was left alone in the car, including who left Eva alone in the car and for how long, as the sole factfinder, it was the trial court's role to determine the witnesses' credibility and the weight to give their testimony and to resolve any inconsistencies or conflicts in the evidence. *See In re J.F.-G.*, 627 S.W.3d at 312; *In re R.J.*, 579 S.W.3d at 117. The trial court, as the sole factfinder, could have disbelieved Mother's and Father's testimony and, instead, credited the evidence and testimony reflecting that Mother and Father left Eva alone in the car for an hour while they shopped or shoplifted at Ulta, and further could have reasonably inferred that the presence of drugs in the car and Mother's admission to using drugs the day before may have contributed to their decision to leave Eva in the car.[17] *See In re J.P.B.*, 180 S.W.3d 570, 574 (Tex. 2005) (stating it is within factfinder's province to judge parent's demeanor and to disbelieve parent's

---

[17] Our opinion should not be read to suggest that leaving a child alone in a car for a brief period while the car is locked, and the air conditioning is on constitutes endangerment per se. It is merely some evidence that the trial court could consider together with all evidence presented to it when determining whether there was clear and convincing evidence under Subsection (E).

88

testimony); *Jordan*, 325 S.W.3d at 713 (stating "[w]hen there is conflicting evidence [in a parental termination case], it is the province of the trier of fact to resolve such conflicts").

In light of the evidence that Mother had used drugs the day before Eva was left alone in the car, Mother was intoxicated and tested positive for cocaine and marijuana when she lived with Brad and Charlotte, and Father's statements that he and Mother had been using drugs, they needed to "get clean" and they were detoxing while they stayed with Brad and Charlotte, the trial court could have disbelieved Mother's testimony that she was not using drugs the day of the parking lot incident, and reasonably inferred that Mother was under the influence of drugs and her judgment had been at least somewhat impaired when she decided to leave Eva alone in the car for an hour while she and Father shopped. *See In re R.R.A.*, 687 S.W.3d at 278 (stating endangerment analysis includes assessment of whether parent's "illegal drug use present[ed] a risk to the parent's 'ability to parent'"); *id.* at 279 n.50 ("Reviewing courts . . . must defer to the factfinder's judgment as to the credibility of the witnesses and the weight to give their testimony, including reasonable and logical inferences from the evidence.").

Mother's failure to successfully complete substance abuse counseling also supports the trial court's finding of endangerment under Subsection (E). The record reflects that Mother failed to maintain her sobriety throughout treatment, and she

was unsuccessfully discharged from substance abuse counseling because she did not keep regular attendance and address all her treatment goals and objectives. *See In re C.D.G.*, No. 14-17-00261-CV, 2017 WL 4320176, at \*6 (Tex. App.—Houston [14th Dist.] Sept. 28, 2017, pet. denied) (mem. op.) (considering evidence parent failed to complete substance abuse treatment when analyzing sufficiency of evidence for finding of endangerment under Subsection (E)).

Viewing the evidence in the light most favorable to trial court's finding, we conclude the trial court could have formed a firm belief or conviction that Mother engaged in conduct or knowingly placed Eva with persons who engaged in conduct that endangered Eva's physical or emotional well-being. TEX. FAM. CODE § 161.001(b)(1)(E); *In re J.F.C.*, 96 S.W.3d at 266.

Further, in view of the entire record, we conclude that the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that Mother engaged in conduct or knowingly placed Eva with persons who engaged in conduct that endangered Eva's physical or emotional well-being. TEX. FAM. CODE § 161.001(b)(1)(E); *In re J.F.C.*, 96 S.W.3d at 266

We overrule Mother's third issue.[18]

---

[18] Because there was clear and convincing evidence supporting the trial court's findings under Section 161.001(b)(1)(E), it is not necessary for us to decide whether there was also sufficient evidence supporting the trial court's findings that Mother committed the predicate acts under Section 161.001(b)(1)(D) and (O). *See In re*

## C. Father: Endangerment Under Subsection 161.001(b)(1)(E)

In his second issue, Father argues there is legally and factually insufficient evidence that he endangered Eva by engaging in conduct or knowingly placing Eva with persons who engaged in conduct that endangered Eva's physical or emotional well-being. Father argues that the evidence is insufficient to prove endangerment under Subsection (E) because there is no evidence that Eva was exposed to loss, injury, or otherwise placed in jeopardy when she was left unattended in the car, there is no admissible evidence that he tested positive for drugs or was in possession of illegal drugs during the pendency of the case, and there is no evidence that he engaged in criminal activity while Eva has been in the Department's care.

Although Eva was not harmed, a child does not need to suffer actual physical injury for a trial court to make a finding of endangerment. *In re N.R.*, 101 S.W.3d 771, 775 (Tex. App.—Texarkana 2003, no pet.) (citing *Boyd*, 727 S.W.2d at 533). Rather, a child is endangered when the child is placed or allowed to remain in an environment that "pose[s] a real *threat* of injury or harm to the child." *In re N.R.*, 101 S.W.3d at 776 (emphasis added).

The evidence reflects that Father engaged in illicit drug use before and after Eva came into the Department's care and that his continued illegal drug use

---

*A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) (stating only one predicate finding under Section 161.001(b)(1) is necessary to support decree of termination when there is also finding that termination is in child's best interest).

endangered Eva's physical and emotional well-being and impacted his ability to care for Eva. Father's drug test results reflect that, while the case was pending, he tested positive for fentynal and norfentanyl multiple times before he stopped testing altogether because he believed NSC was manipulating the results. He also tested positive for oxycodone, oxymorphone, and methamphetamine and he did not appear for drug testing at least four times before he stopped testing in March 2024. This is some evidence that Father repeatedly tested positive for multiple illegal drugs while Eva was in the Department's care, despite knowing that his parental rights were at stake and that he was required to stop using drugs before Eva could be returned to his care, and thus supports the trial court's endangerment finding under Subsection (E). *See In re K.A.C.*, 594 S.W.3d at 373 ("[E]vidence that the parent continued to use illegal drugs even though the parent knew her parental rights were in jeopardy is conduct showing a voluntary, deliberate, and conscious course of conduct, which by its nature, endangers a child's well-being."); *see also In re R.R.A.*, 687 S.W.3d at 281 (recognizing parent's "positive drug tests in 2020 and across-the-board refusal to undergo service-plan tests from November 2020 to September 2021 sufficiently develop[ed] [his] continued pattern of drug use"); *In re J.M.T.*, 519 S.W.3d at 269 (stating refusal to provide hair sample permitted court to infer father refused testing because it would be positive); *In re M.T.W.*, 2011 WL 6938542, at *13 (stating evidence parent engaged in illegal drug activity after agreeing not to do so in service

92

plan for reunification with his child supports endangerment finding under Subsection (E)).

Even though Father denied using illegal drugs and disputed the accuracy of the drug test results, the trial court, as the sole factfinder, could have credited testimony regarding the accuracy and reliability of the drug test results over Father's testimony. *See In re S.C.F.*, 522 S.W.3d at 703 (holding trial court sitting as factfinder could credit laboratory reports and witness testimony over parent's denial of drug use and his claim that positive drug test result was false).

Even setting aside the results of Father's drug tests, there is other evidence in the record that Father used drugs before and after Eva was taken into the Department's care, including Father's admissions of drug use. The removal affidavit states that Mother and Father "willingly admitted to using heroin and abusing pills while actively []caring for [Eva] and stated they recently used two days prior to the intake coming in." Brad and Charlotte told the Department that Mother and Father were "still participat[ing] in active drug use" when they stayed with Brad and Charlotte for a week after the incident in the Ulta parking lot. Father also told the Department that he and Mother left Eva with Brad and Charlotte while he and Mother "went through detox" and he told Charlotte that he and Mother had been using drugs, and they needed to stay with Charlotte because they needed to "get clean."

Brad testified that Father had a history of substance abuse, and he had been prescribed suboxone, which is used to treat opioid addictions to assist with withdrawal symptoms. Charlotte testified that Father told her that he had "some opioid problems before" and he had attended rehab to treat his addiction to "heroin or opioid or something to that form," but he did not complete the program. Father told Charlotte about his and Mother's experiences going through withdrawal and stated that the "opioids" found in the car that were determined to be fentanyl "were his."

Father also admitted in his psychological evaluations and substance abuse assessment that he had used drugs before and after Eva came into the Department's care in March 2023. During his August 9, 2023 psychological evaluation, Father reported that he used marijuana in the past and he had been physically dependent upon hydrocodone when he was in college. Father stated that he had "admitted himself into a detox facility" to address his hydrocodone addiction. Although Father reported that he had "fully detoxed and never relapsed on hydrocodone after his treatment," he stated during his substance abuse assessment that he had "last used opiates just before the incident with [the Department] occurred" in March 2023. In his October 19, 2023 psychological evaluation, Father stated that he had "recently relapsed" and used hydrocodone one to two weeks earlier. In his October 25, 2023 substance abuse assessment, Father stated that he had used "an assortment of opiates

throughout college" and "he had a slip up after his kid got removed, he had a slip up" at the end of September 2023 or beginning of October 2023. Gabriel also testified without objection that Father tested positive for fentanyl, norfentanyl, and amphetamines multiple times during the pendency of the case and he also tested positive for oxycodone, oxymorphone and methamphetamine.

"While illegal drug use alone may not be sufficient to show endangerment, a pattern of drug use accompanied by circumstances that indicate related dangers to the child can establish a substantial *risk* of harm." *In re R.R.A.*, 687 S.W.3d at 278 (emphasis in original). Drug-use evidence should not be evaluated in isolation; rather, it should be considered alongside evidence showing that the parent's "illegal drug use presents a risk to [their] 'ability to parent.'" *Id.* (quoting *In re J.O.A.*, 283 S.W.3d at 345).

There is evidence from which the trial court could have reasonably inferred that Father's pattern of illegal drug use adversely affected his ability to parent Eva, thus presenting a substantial risk to Eva's emotional well-being. *See In re R.R.A.*, 687 S.W.3d at 278 (stating courts should consider "aggregate weight" of evidence of drug use and surrounding circumstances when evaluating endangerment finding); *see also In re A.V.*, 697 S.W.3d at 659 (characterizing *In re R.R.A.* standard as "holistic endangerment review"); *In re C.C.*, 720 S.W.3d 41, 58 (Tex. App.— Texarkana 2025, no pet.) (stating "we review endangerment findings considering the

'aggregate weight' of factors supported by the evidence") (citing *In re R.R.A.*, 687 S.W.3d at 281). Brad testified that he was aware that Mother and Father were not drug testing or completing their services, and this was one of the reasons why he and Charlotte stopped supervising visits between Eva and Mother and Father in June or July 2024. According to Brad, he and Charlotte did not "know [Mother's or Father's] state of mind" or "what's going on," and they did not want to "take that chance" with Eva. Father's inability to visit with Eva on the weekends due in part to his continued drug use is particularly significant because he had visited with Eva only twice at the Department's offices in the span of fifteen months since the case began in April 2023, even though the Department had never suspended his visits, and he had relied on the weekend visits supervised by Brad and Charlotte to maintain a relationship with Eva. There is no evidence that Father made an effort to allay Brad's and Charlotte's concerns that he was continuing to use drugs until at least November 2024, when Brad agreed to supervise a visit between Father and Eva. The trial court could have reasonably inferred from this evidence that, like Mother, Father prioritized his drug usage over being able to maintain a parental relationship with Eva, and his willingness and ability to parent Eva was thus adversely affected by his pattern of ongoing illegal drug use. *See In re R.R.A.*, 687 S.W.3d at 278 (stating endangerment analysis includes assessment of whether parent's "illegal drug use present[ed] a risk to the parent's 'ability to parent'"); *see also In re J.G.*, 2022

96

WL 187983, at *9 (stating parent's failure to visit can endanger child's emotional well-being and supports finding of endangerment under Subsection (E)).

Given the evidence that Father had admitted to using heroin and abusing pills while actively caring for Eva, using heroin and pills the day before Eva was left alone in the car for an hour, that he and Mother had been using drugs before they moved in with Brad and Charlotte and they needed to get clean, that the fentanyl in the car belonged to him, and the evidence that Mother and Father had to move out of Brad's house because they were continuing to use drugs, the trial court could have reasonably inferred from this evidence that Father was under the influence of drugs and his judgment had been at least somewhat impaired when he left Eva in the car unattended,[19] and thus, that his drug use negatively impacted his parenting abilities.[20] *See In re R.R.A.*, 687 S.W.3d at 278 (stating endangerment analysis includes assessment of whether parent's "illegal drug use present[ed] a risk to the parent's 'ability to parent'" and courts should consider "aggregate weight" of evidence of

---

[19]    As with Mother, there is conflicting evidence regarding the circumstances in which Eva was left alone in the car, including who left Eva alone in the car and for how long.  As the sole factfinder, it was the trial court's role to determine the witnesses' credibility and the weight to give their testimony and to resolves any inconsistencies or conflicts in the evidence. *See In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021); *In re R.J.*, 579 S.W.3d 97, 117 (Tex. App.—Houston [1st Dist.] 2019, pet. denied).

[20]    As previously mentioned, our opinion should not be read to suggest that leaving a child alone in a car for a brief period while the car is locked, and the air conditioning is on constitutes endangerment per se.  It is merely some evidence that the trial court could consider when determining whether there was clear and convincing evidence under Subsection (E).

drug use and surrounding circumstances when evaluating endangerment finding); *see also In re J.M.T.*, 519 S.W.3d at 269 ("A parent's exercise of poor judgment currently and in the past demonstrates an inability to provide adequate care for the child.").[21]

The February 22, 2025 permanency report states that Father had not complied with his substance abuse assessment's recommendations because he had been "unsuccessfully discharged from substance abuse therapy due to not meeting his therapeutic goals," and Father had not complied with his psychological evaluation's recommendations because he had been unsuccessfully discharged from outpatient treatment, he was not drug testing through the Department, and he had been unsuccessfully discharged from individual therapy. Father's failure to successfully complete substance abuse counseling also supports the trial court's finding of endangerment under Subsection (E). *See In re C.D.G.*, 2017 WL 4320176, at *6 (considering evidence parent failed to complete substance abuse treatment when analyzing sufficiency of evidence for finding of endangerment under Subsection (E)).

---

[21] While there was no direct testimony that Mother or Father were under the influence when the car incident took place, there is evidence from which the trial court reasonably could have concluded that Father's drug use had a detrimental impact on his judgment and may have led in part to Eva being placed in a situation that exposed her to some risk of harm.

Mother had been Eva's primary caregiver, and according to Charlotte, Father knew that Mother had been using drugs before the Department became involved with the family, and he nevertheless left Eva with Mother while he was at work. Father's decision to leave his infant daughter in the sole care of someone he knew used drugs also supports a finding of endangerment under Subsection (E). *See generally In re I.R.*, No. 13-24-00632-CV, 2025 WL 1261430, at *7 (Tex. App.—Corpus Christi–Edinburg May 1, 2025, no pet.) (mem. op.) ("Drug use may also create a dangerous environment for the children.").

Viewing the evidence in the light most favorable to trial court's finding, we conclude the trial court could have formed a firm belief or conviction that Father endangered Eva by engaging in conduct or knowingly placing Eva with persons who engaged in conduct that endangered Eva's physical or emotional well-being. TEX. FAM. CODE § 161.001(b)(1)(E); *In re J.F.C.*, 96 S.W.3d at 266.

Further, in view of the entire record, we conclude that the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that Father endangered Eva by engaging in conduct or knowingly placing Eva with persons who engaged in conduct that endangered Eva's physical or emotional well-being. TEX. FAM. CODE § 161.001(b)(1)(E); *In re J.F.C.*, 96 S.W.3d at 266.

We overrule Father's second issue.[22]

## Best Interest

Mother and Father argue there is legally and factually insufficient evidence supporting the trial court's findings that termination of Mother's and Father's parental rights was in Eva's best interest.

## A. Applicable Law

The purpose of the State's intervention in the parent-child relationship is to protect the best interests of the children, not to punish parents for their conduct. *See In re A.V.*, 113 S.W.3d at 361. There is a strong presumption that the best interest of a child is served by keeping the child with a parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). But there is also a presumption that the "prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." TEX. FAM. CODE § 263.307(a); *see also In re B.J.C.*, 495 S.W.3d 29, 39 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (noting child's need for

---

[22] Because there was clear and convincing evidence supporting the trial court's findings under Section 161.001(b)(1)(E), it is not necessary for us to decide whether there was also sufficient evidence supporting the trial court's findings that Father committed the predicate acts under Section 161.001(b)(1)(D) and (O). *See In re A.V.*, 113 S.W.3d at 362 (stating only one predicate finding under Section 161.001(b)(1) is necessary to support decree of termination when there is also finding that termination is in child's best interest).

permanence through establishment of stable, permanent home is paramount consideration in best-interest determination).

To determine whether parental termination is in a child's best interest, courts may consider the following non-exclusive factors: (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the persons seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors are not exhaustive, and evidence is not required on every factor to support a finding that termination of parental rights is in the child's best interest. *Id.*; *In re D.R.A.*, 374 S.W.3d at 533. Courts may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as direct evidence when conducting a best-interest analysis. *See In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied).

We may also consider the statutory factors under Texas Family Code Section 263.307, including (1) the child's age and physical and mental vulnerabilities;

(2) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (3) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (4) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (5) whether the child's family demonstrates adequate parenting skills, including providing the child with minimally adequate health and nutritional care, a safe physical home environment, and an understanding of the child's needs and capabilities; and (6) whether an adequate social support system consisting of an extended family and friends is available to the child. TEX. FAM. CODE § 263.307(b); *In re R.R.*, 209 S.W.3d at 116.

A parent's past conduct is probative of his future conduct when evaluating the child's best interest. *See In re O.N.H.*, 401 S.W.3d 681, 684 (Tex. App.—San Antonio 2013, no pet.); *see also Jordan*, 325 S.W.3d at 724. A factfinder may also infer that past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent when assessing the best interest of the child. *See In re D.M.*, 452 S.W.3d 462, 471 (Tex. App.—San Antonio 2014, no pet.).

Evidence supporting termination under one of the predicate grounds listed in Section 161.001(b)(1) may also be considered in support of a finding that termination is in the best interest of the child. *See In re C.H.*, 89 S.W.3d 17, 28 (Tex.

2002) (holding same evidence may be probative of both Section 161.001(b)(1) grounds and best interest).

**B.    Analysis - Mother**

Multiple factors support the trial court's finding that termination of Mother's parental rights was in Eva's best interest, the first of which is Mother's ongoing use of multiple illegal narcotics throughout the pendency of the case. *See In re E.D.*, 682 S.W.3d 595, 607 (Tex. App.—Houston [1st Dist.] 2023, pet. denied) ("A continuing pattern of illegal drug use. . . implicates most of the *Holley* factors and will support a finding that termination of parental rights is in a child's best interest."). The record reflects that during the two years the case has been pending, beginning on March 29, 2023, Mother tested positive multiple times for fentanyl, norfentanyl, methamphetamine, cocaine or cocaine metabolites, amphetamines, and marijuana. She also failed to appear for multiple drug tests and refused to take any drug tests after March 2024, despite being ordered to do so by the court or requested to take a test by the Department and even thought she was not able to visit with Eva unless she submitted to drug testing.

Brad and Charlotte were concerned about Mother's ability to care for Eva based on their observations of Mother's behavior when she lived with them for a week after the police found Eva alone in the car. Charlotte was concerned for Eva's safety when she saw Mother sitting in a chair "with her head cocked back, eyes wide

103

open" while Eva was "kind of crawling all over" her. Charlotte also believed that Mother was intoxicated when she lived in her home for a week because Mother would be "unsteady, unbalanced, sluggish, sleepy, and then in a few hours, she would be very happy and joyful." Mother had also "acted really confused," "was kind of all over the place," and "[m]aybe a little manic," when she should have been focused on Eva.

According to Brad, Mother was incoherent sometimes, spoke nonsensically, and she did not see "rational." She also seemed a "little loopy" in the evenings and she would "hold [Eva] kind of wildly." Brad and Charlotte were also concerned because Mother and Father would go to their home most evenings and leave Eva in their care even though the safety plan required either Mother or Father to remain in Brad and Charlotte's home with Eva at all times. One evening, Mother and Father did not return to Brad and Charlotte's home until 6 p.m. the next day and another evening Mother and Father were "sluggish" when they returned to Brad's home at 1 a.m. Father told the Department that he and Mother left Eva with Brad and Charlotte because he and Mother were going through detox, and he told Charlotte that he and Mother had been using drugs and "needed to get clean" while they were living in Charlotte's home.

This evidence demonstrates a two-year pattern of ongoing illegal drug use during the pendency of the case when Mother knew her parental rights to Eva were

in jeopardy, and when she knew that she was required to stop using drugs before Eva could be returned to her care. The evidence thus supports the trial court's finding that termination of Mother's parental rights was in Eva's best interest. *See id.*; *see also In re N.J.H.*, 575 S.W.3d 822, 834–36 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (holding father's history of drug use and continued drug use during case implicated second, third, fourth, and seventh *Holley* factors—child's emotional and physical needs, emotional and physical danger to child, father's parental abilities, and stability of home—and supported best-interest finding); *In re K.P.*, 498 S.W.3d 157, 174–75 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) (holding mother's continuing drug use, evidenced by repeatedly testing positive for drugs, implicated third, fourth, and eighth *Holley* factors—emotional and physical danger to child, mother's parental abilities, and parental acts or omissions indicating improper parent-child relationship—and supported best-interest finding).

Although Mother denied that she used illegal drugs around Eva, a parent's use of illegal drugs can constitute endangerment even if it occurs outside of the child's presence. *See In re J.O.A.*, 283 S.W.3d at 345 (stating "endangering conduct is not limited to actions directed towards the child"); *In re A.M.*, 495 S.W.3d 573, 579 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) ("Because it significantly harms the parenting relationship, drug activity can constitute endangerment even if it transpires outside the child's presence."). The trial court could have also reasonably

credited Charlotte's testimony that Mother was intoxicated when she cared for Eva while at Charlotte's home, and disbelieved Mother's testimony to the contrary. *See In re J.P.B.*, 180 S.W.3d at 574 (stating it is within factfinder's province to access parent's demeanor and to disbelieve parent's testimony).

The trial court could also infer from this evidence and Mother's repeated denials of using any illegal drugs, despite a host of positive drug test results, that such endangering conduct could reoccur in the future if Eva was returned to Mother's care. *See In re B.K.D.*, 131 S.W.3d at 17 (stating factfinder may infer that past conduct endangering child's well-being may recur in future if child returned to parent). This endangering conduct is also an indication of Mother's parenting abilities. *See In re H.M.O.L.*, No. 01-17-00775-CV, 2018 WL 1659981, at *18 (Tex. App.—Houston [1st Dist.] Apr. 6, 2018, pet. denied) (mem. op.); *Holley*, 544 S.W.2d at 372 (identifying parental abilities as best interest factor).

Mother's unwillingness to acknowledge her substance abuse problems and insistence that she only tested positive for illegal narcotics in the past because the laboratory was fabricating or manipulating the results also supports the trial court's finding that termination of Mother's parental rights is in Eva's best interest. *See In re A.J.W.*, No. 04-19-00346-CV, 2019 WL 6333468, at *6 (Tex. App.—San Antonio Nov. 27, 2019, no pet.) (mem. op.) ("The [trial] court could have rationally concluded that [the mother] is unable to protect her children or to provide them a

safe and stable environment because she minimizes her drug problem."); *In re A.E.*, No. 05-14-01340-CV, 2015 WL 1184179, at \*7 (Tex. App.—Dallas Mar. 16, 2015, pet. denied) (mem. op.) (stating mother's "choice to minimize her past drug use" was factor of "particular significance" in best-interest analysis); *see also In re L.M.*, 572 S.W.3d 823, 835 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (stating parent's unwillingness to admit he has substance-abuse problem suggests parent will continue to engage in same endangering behavior).

The evidence that Mother left Eva alone in the car while she shopped for an hour also provides some support for the trial court's best interest finding. *See In re C.H.*, 89 S.W.3d at 28 (holding same evidence may be probative of both Section 161.001(b)(1) grounds and best interest).

Mother argues that termination of her parental rights is not in Eva's best interest because Eva and Mother are bonded, Mother visited with Eva for many months while the case has been pending, and the visits were safe, appropriate, and affectionate. Mother, who is described in a permanency report as "attentive and loving" and "very gentle," also brought food, toys, and gifts, and was actively engaged with Eva throughout the visits.

Eva, who was almost three years old when the trial ended in April 2025, was too young to express her desires. *See In re A.J.D.-J.*, 667 S.W.3d 813, 833 (Tex. App.—Houston [1st Dist.] 2023, no pet.) (stating "the general rule is that when a

child is too young to express herself, her desires are neutral as to the trial court's best-interest finding, unless there is circumstantial evidence from which the factfinder could infer her desires by proxy"). The record reflects that Eva was bonded with Mother before Mother's visits were suspended in July 2024, and Eva was bonded with Brad and Charlotte, with whom she had lived for the two years before Mother's and Father's rights were terminated in April 2025. Although Mother had not seen Eva during the nine months prior to the trial court's terminating her rights, we conclude that this factor is neutral as to whether termination of Mother's rights is in Eva's best interest. *See In re J.C.P.L.*, No. 01-24-00723-CV, 2025 WL 757159, at *9 (Tex. App.—Houston [1st Dist.] Mar. 11, 2025, pet. denied) (mem. op.) (holding first *Holley* factor—child's desires—neutral when caseworker testified that child was bonded with foster family and happy to see parents during visits and enjoyed spending time with them).

With regard to Mother's visits with Eva, Gabriel, Charlotte, and Brad testified that Mother was hostile and aggressive towards Gabriel and Charlotte during visits while Eva was present. According to Gabriel, Mother was disrespectful, aggressive, and argumentative when she visited Eva at the Department's office, and Mother's behavior and her inconsistent drug testing prompted the Department to request that Mother's visits with Eva be changed from in-person to virtual. Brad testified that during some of the weekend visits supervised by Charlotte, Mother "would have

108

words" with Charlotte that "sounded somewhat threatening" and unsafe and the visits became more "hostile" after the agreement was signed in February 2024. Brad and Charlotte stopped the weekend visits in June or July 2024 because they were concerned for Charlotte's safety and Charlotte was worried about the impact witnessing these encounters had on Eva. *See generally In re D.E.M.*, No. 04-17-00757-CV, 2018 WL 1831622, at *3 (Tex. App.—San Antonio Apr. 18, 2018, no pet.) (mem. op.) (considering parent's angry and emotional outbursts during visits in best-interest determination).

Although the permanency reports reflect that Mother was "attentive and loving" and actively engaged with Eva throughout some of their visits, Gabriel testified that she was concerned about Mother's parenting abilities because Mother was often distracted during her visits with Eva, would miss feeding cues from Eva, "seemed a little dazed," and would spend time on her phone instead of focusing her attention on Eva. Similarly, Franklin, Eva's guardian ad litem, testified that she observed one visit with Mother and Eva in December 2023 or January 2024 and she was concerned that Mother did not "fully understand[] how to engage with [Eva], how to properly play with her or to notice the cues of the child when the child is sleepy or, you know, need[s] something different or is hungry." Eva, who was three years old at the time of trial, would not be able to protect herself from the dangers of an unstable living situation created by Mother's ongoing drug use and her young

age thus renders her vulnerable if she was rendered to Mother's care. Eva's young age thus also supports the trial court's finding that termination of Mother's rights was in her best interest. *See* TEX. FAM. CODE § 263.307(b)(1) (identifying child's age and physical and mental vulnerabilities as best interest factors); *In re J.M.T.*, 519 S.W.3d at 270 (noting that young age of child—fourteen months at time of trial—weighed in favor of trial court's finding that termination was in child's best interest); *see also In re A.L.B.*, No. 01-17-00547-CV, 2017 WL 6519969, *5 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (mem. op.) (stating children's young ages—five and six years old—rendered them vulnerable if left with parent unable or unwilling to protect them or attend to their needs).

Furthermore, the positive, successful visits Mother references occurred between June 2023 and March 2024. The same permanency reports Mother relies on also reflect that Mother began missing visits and stopped providing support for Eva in April 2024. According to the reports, Mother missed three of four scheduled visits in April 2024 and although she appeared for two visits in May 2024, one of those visits was cancelled because Mother was thirty minutes late. Although Mother regularly visited Eva in June and July 2024, there is no indication that she provided support for Eva during that time and Mother admitted that she had not given Brad and Charlotte anything for Eva since May 2024. *See In re L.M.*, 572 S.W.3d at 836 (stating parent's "lack of all contact with a child without any proffered excuse and

110

no effort to ensure [the child's] wellbeing" supports endangerment finding); *see also In re R.R.*, 711 S.W.3d 126, 140 (Tex. App.—Houston [1st Dist.] 2024, no pet.) (noting that missed visitations and failure to complete court-ordered services "may constitute evidence supporting endangerment finding because such conduct subjects children to instability and uncertainty, which endangers them"). More importantly, after a hearing on July 23, 2024, the trial court ordered Mother to take a drug test and suspended her visits with Eva until she could provide a negative drug test and act civilly during her visits with Eva. Mother failed to comply with the trial court's order and she also rejected the trial court's subsequent offers during trial to bring NSC to the courthouse to administer a drug test to Mother so that her visitation with Eva could be immediately reinstated, even if the test was positive. As a result, Mother's visitation was never reinstated, and she had not seen Eva for nine months when trial concluded on April 2, 2025. Mother's failure to contact Eva after July 23, 2024 also supports the trial court's best interest finding. *See In re J.G.*, 2022 WL 187983, at *9 (stating parent's failure to visit child can endanger child's emotional well-being).

Although she completed parenting classes, Mother did not comply with her substance abuse assessment's other recommendations because she did not provide the Department with proof that she was attending NA/AA, and she had not been attending individual therapy. Although she had participated in outpatient treatment,

111

she was not successfully discharged because her attendance was inconsistent, she did not address all her treatment goals and objectives, and she failed to maintain her sobriety throughout treatment. This evidence also supports the trial court's best-interest finding. *See In re M.L.G.J.*, No. 14-14-00800-CV, 2015 WL 1402652, at *11 (Tex. App.—Houston [14th Dist.] Mar. 24, 2015, no pet.) (mem. op.) (holding parent's "failure to make use of the rehabilitative services offered by the Department supports the trial court's best-interest finding" when parent had "opportunity to address her drug use and parenting through her family service plan [and] she failed to do so"); *In re D.R.*, 631 S.W.3d at 835 ("Mother's use of methamphetamine during the pendency of the case, even after being released from inpatient treatment, showed that she lacked the parental abilities necessary to care for the children, that she failed to learn from the programs available to assist her, and that the existing parent-child relationship was not a proper one."); *see also In re R.R.A.*, 687 S.W.3d at 283 (Blacklock, J., dissenting) ("Drug addiction obviously *is incompatible* with good parenting . . . .") (emphasis added).

Multiple witnesses expressed concerns about Mother's and Father's commitment to achieving and maintaining sobriety. Franklin testified that neither Mother nor Father successfully completed their required services, they both "tested positive for fentanyl, which is a very dangerous drug, on multiple occasions," neither parent had demonstrated the "ability to understand the seriousness of [fentanyl]," or

demonstrated "the willingness to get sober and have a safe, healthy lifestyle for their child." Brad testified that he was concerned that Mother and Father had not been able to maintain sobriety and complete services while Eva was in the Department's care, and he was skeptical of whether they would be able to remain drug-free if the Department was not involved in their lives.

Mother's psychological evaluation states that her "level of treatment motivation is somewhat lower than is typical of individuals being seen in treatment settings" and her "responses suggest that she is satisfied with herself as she is, that she is not experiencing marked distress, and that, as a result, she sees little need for changes in her behavior." Franklin testified that neither Mother nor Father "seem[ed] to take any responsibility for the situations that they've been in and the drugs that they are using." According to Franklin, Mother and Father repeatedly denied using fentanyl, they did not admit to "any substance abuse at all," and they reported to Child Advocates that they "had no problems while still testing positive for the drug" and claimed that test results were positive because "people [were] switching their tests in National Screening."

This evidence of Mother's and Father's inability or unwillingness to effectuate positive changes in their lives by addressing their substance abuse issues supports the trial court's findings that termination of their parental rights is in Eva's best interest. *See* TEX. FAM. CODE § 263.307(b)(11) (identifying parent's

113

"willingness and ability . . . to effect positive environmental and personal changes within a reasonable period of time" as best interest factor).

Mother argues that the fact that she maintained suitable housing during the pendency of the case, as evidenced by the lease or mortgage agreement she and Father provided to the Department August 30, 2023, demonstrates the termination of her rights was not in Eva's best interest. Although Gabriel did not have any concerns about Mother's home when she visited in October 2023, no one from the Department or Child Advocates had visited Mother's home since that time. Thorn, Eva's current caseworker, testified that he went to Mother's and Father's home twice after he was assigned to the case in August 2024, but no one answered, and Mother and Father had not allowed him to visit their home even after he explained that he needed to visit the home to determine whether it was a safe and appropriate environment for Eva. Even assuming the lease/mortgage agreement provided to the Department in August 2023 demonstrates that Mother and Father maintained stable housing during the pendency of the case, there is no evidence the home was clean, free of safety hazards and suitable for a child.

By most accounts, Brad and Charlotte, who are Eva's paternal grandparents, have provided Eva with a loving, safe, stable, and drug-free home and they are able to meet her present and future physical and emotional needs. Franklin testified that Eva is bonded with Brad and Charlotte, and she is "thriving" and "doing

114

outstanding" in their home. According to Franklin, Brad and Charlotte have excellent parenting skills, their home is a protective placement for Eva, and Child Advocates trusts them "to be a gatekeeper to contact with the parents." Thorn, Eva's caseworker, testified that Brad and Charlotte have provided Eva with a loving and nurturing environment where she is happy and feels safe, and the Department believes that Brad and Charlotte will facilitate contact between Eva and Mother and Father but only if it is safe and appropriate to do so.

Brad and Charlotte, who have been married for twenty-one years and lived in the same home for eighteen years, want to adopt Eva and provide her the stability and permanence that she needs in her life if Mother's and Father's rights are terminated. They have also expressed a willingness to restart visitation and allow Eva to have a relationship with Mother and Father in the future if Mother and Father are "stable" and "clean." *See Holley*, 544 S.W.2d at 372 (recognizing child's present and future physical and emotional needs, present and future emotional and physical dangers to child, parental abilities of persons seeking custody, plans for child by individuals seeking custody, and stability of home or proposed placement as best interest factors).

Although Father testified that he does not believe that Brad and Charlotte are nurturing and loving towards Eva and he was concerned about their ability to parent Eva, the trial court, as the sole factfinder, could have disbelieved Father's testimony

and instead credited Thorn's and Franklin's testimony that Brad and Charlotte had provided Eva with a safe, stable, loving, and protective home and they were able to meet Eva's present and future physical and emotional needs. *See In re J.F.-G.*, 627 S.W.3d at 311–12 (stating appellate courts should defer to factfinder's determinations regarding witness credibility); *see also In re J.P.B.*, 180 S.W.3d at 574 (noting it is within factfinder's province to access parent's demeanor and to disbelieve parent's testimony).

Viewing the evidence in the light most favorable to the trial court's finding, we conclude the trial court could have formed a firm belief or conviction that termination of Mother's parental rights was in Eva's best interest. *See In re J.F.C.*, 96 S.W.3d at 266.

Further, in view of the entire record, we conclude that the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that termination of Mother's parental rights was in Eva's best interest. *Id.*; *see also In re A.C.*, 560 S.W.3d at 631.

We overrule Mother's challenge to the legal and factual sufficiency of the evidence supporting the trial court's best interest finding.

## C. Analysis – Father

Multiple factors support the trial court's finding that termination of Father's parental rights was in Eva's best interest, the first of which is Father's endangering

conduct. In addition to supporting the trial court's finding under Subsection (E) that Father endangered Eva by engaging in conduct or knowingly placing Eva with persons who engaged in conduct that endangered Eva's physical or emotional well-being, the evidence that Father repeatedly tested positive for multiple illegal drugs while Eva was in the Department's care, despite knowing that his parental rights were at stake and that he was required to stop using drugs before Eva could be returned to his care, and his failure to successfully complete substance abuse counseling also support the trial court's best interest finding. *See In re M.L.G.J.*, 2015 WL 1402652, at *11 (holding parent's "failure to make use of the rehabilitative services offered by the Department supports the trial court's best-interest finding" when parent had "opportunity to address her drug use and parenting through her family service plan [and] she failed to do so"); *In re M.T.W.*, 2011 WL 6938542, at *13 (stating evidence parent engaged in illegal drug activity after agreeing not to do so in service plan for reunification with his child supports endangerment finding under Subsection (E)).

The trial court could infer from this evidence and Father's repeated denials of using any illegal drugs, despite a host of positive drug test results, that such endangering conduct could reoccur in the future if Eva was returned to Father's care. *See In re B.K.D.*, 131 S.W.3d at 17 (stating factfinder may infer that past conduct endangering child's well-being may recur in future if child returned to parent).

117

Father's past endangering conduct is also an indication of his parenting abilities. *See In re H.M.O.L.*, 2018 WL 1659981 at *18; *Holley*, 544 S.W.2d at 372 (identifying parental abilities as best interest factor).

Eva's young age also supports the trial court's finding that termination of Father's rights was in her best interest because she would not be able to protect herself from the dangers of an unstable living situation created by Father's ongoing drug use. *See* TEX. FAM. CODE § 263.307(b)(1) (identifying child's age and physical and mental vulnerabilities as best interest factors); *In re J.M.T.*, 519 S.W.3d at 270 (noting that young age of child—fourteen months at time of trial—weighed in favor of trial court's finding that termination was in child's best interest); *see also In re A.L.B.*, 2017 WL 6519969 *5 (stating children's young ages—five and six years old—rendered them vulnerable if left with parent unable or unwilling to protect them or attend to their needs).

Father's unwillingness to acknowledge his substance abuse problems and insistence that he only tested positive for illegal narcotics in the past because the laboratory was fabricating or manipulating the results also supports the trial court's finding that termination of his parental rights is in Eva's best interest. *See In re A.J.W.*, 2019 WL 6333468, at *6 ("The [trial] court could have rationally concluded that [the mother] is unable to protect her children or to provide them a safe and stable environment because she minimizes her drug problem."); *In re A.E.*, 2015 WL

118

1184179, at *7 (stating mother's "choice to minimize her past drug use" was factor of "particular significance" in best-interest analysis.); *see also In re L.M.*, 572 S.W.3d at 835 (stating parent's unwillingness to admit he has substance-abuse problem suggests parent will continue to engage in same endangering behavior).

Multiple witnesses expressed concerns about Father's commitment to achieving and maintaining sobriety. Franklin testified that Father had "tested positive for fentanyl, which is a very dangerous drug, on multiple occasions," and he had not demonstrated the "ability to understand the seriousness of [fentanyl]," or "the willingness to get sober and have a safe, healthy lifestyle for [his] child." According to Franklin, Father had repeatedly denied using fentanyl and other illegal substances despite testing positive for the narcotics and he blamed the positive test results on the laboratory. Charlotte testified that she and Brad had not seen any progress on Father's part, and it would have made a "big difference" to her if Father had "completed services and been testing negative for the Department." Brad also expressed concern that Father had continued to use illegal drugs while the case was pending, and he questioned whether Father will be able to maintain his sobriety if the Department is no longer involve. This evidence of Father's inability or unwillingness to effectuate positive changes in his life by addressing his substance abuse issues supports the trial court's findings that termination of his parental rights is in Eva's best interest. *See* TEX. FAM. CODE § 263.307(b)(11) (identifying parent's

"willingness and ability . . . to effect positive environmental and personal changes within a reasonable period of time" as best interest factor).

Father argues that termination of his parental rights is not in Eva's best interest because he has had steady, long-term employment and he can provide a safe and suitable home for Eva. Father has worked for his current employer since 2018, and he has an annual salary of $60,000, which is sufficient to meet his, Mother's, and Eva's needs. He and Mother live together in the home he purchased in July 2023. Although Gabriel did not have any concerns about the suitability of Father's home when she visited in October 2023, no one from the Department or Child Advocates has been able to visit Father's home since that time to access whether it is a safe and appropriate environment for Eva and thus there is no evidence that the home was clean, free of safety hazards and suitable for Eva as of the time of trial.

A parent's failure to visit their child can endanger the child's emotional well-being and thus supports a finding that termination of the parent's rights is in the child's best interest. *See In re J.G.*, 2022 WL 187983, at *9 ("[A] trial court may consider in its analysis a parent's failure to visit, which can endanger the child's emotional well-being."). When he testified on November 4, 2024, the third day of trial, Father confirmed that he had not seen Eva in three months because he had limited contact with Brad and Charlotte, and he had not been able to attend any weekday visits with Eva at the Department's office because the visits conflicted with

120

his work schedule. Although he had scheduled a visit with Eva on October 30, 2024, he cancelled the visit when he realized that he would not be able to bring Mother.

Father last visited with Eva on November 9, 2024. Brad testified that the visit went "great," he did not have any concerns about the visit, and he was willing to facilitate and supervise future visits between Eva and Father. Charlotte testified that Eva is bonded with Father, and Father behaved appropriately during his most recent visit, and she was willing to supervise future visits between Father and Eva based on Father's conduct during the previous visit. While evidence that a parent has improved their circumstances weighs against a best interest finding, such improvements, particularly those made on the eve of trial, cannot conclusively negate past endangering behavior. *See In re J.O.A.*, 283 S.W.3d at 346 (stating "[w]hile the recent improvements made by [the parent] are significant, evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value" of past behavior). The trial court reasonably could have concluded that the improvement in Father's circumstances during trial was too recent and of too short a duration to negate Father's past history and impact the best-interest determination. *See In re S.R.*, 452 S.W.3d at 368 (stating "factfinder may conclude that a parent's changes shortly before trial are too late to have an impact on the best-interest determination").

Father argues that Brad's and Charlotte's home is not appropriate for Eva, and he is concerned about their raising Eva because Brad is elderly and predisposed to dementia, Brad and Charlotte have lied to him, they have been hostile or violent towards Mother in front of Eva, Charlotte made sexual advances towards Father when he was a young adult, and they are allowing Father's mother Naomi to have unsupervised visits with Eva even though Father, who was one-years-old, fell from a second-story building while he was in Naomi's care. Father also doubts that Brad and Charlotte are nurturing and loving towards Eva.

Franklin, Eva's guardian ad litem, and Thorn, Eva's caseworker, visit Eva at Brad and Charlotte's home once a month and Franklin and Thorn agree that Brad and Charlotte have provided Eva with a safe, stable, loving, and protective home where Eva is thriving, and Brad and Charlotte can meet Eva's present and future physical and emotional needs. *See Holley*, 544 S.W.2d at 372 (recognizing child's present and future physical and emotional needs, present and future emotional and physical dangers to child, parental abilities of persons seeking custody, plans for child by individuals seeking custody, and stability of home or proposed placement as best interest factors). As the sole factfinder and judge of witness credibility, the trial court could have disbelieved Father's testimony and credited Thorn's and Franklin's testimony that Brad and Charlotte had provided Eva with a safe, stable, and suitable home and they were able to meet Eva's present and future physical and

122

emotional needs. *See In re J.F.-G.*, 627 S.W.3d at 311–12 (stating appellate courts should defer to factfinder's determinations regarding witness credibility); *see also In re J.P.B.*, 180 S.W.3d at 574 (stating it is within factfinder's province to access parent's demeanor and to disbelieve parent's testimony).

"[W]hen a child is too young to express herself, her desires are neutral as to the trial court's best-interest finding, unless there is circumstantial evidence from which the factfinder could infer her desires by proxy." *In re A.J.D.-J.*, 667 S.W.3d at 833. The record reflects that Eva, who was too young to express her desires, was bonded with Father and bonded with Brad and Charlotte. We conclude that this factor is neutral as to whether termination of Father's rights is in Eva's best interest. *See In re J.C.P.L.*, 2025 WL 757159, at *9 (holding first *Holley* factor—child's desires—neutral when caseworker testified that child was bonded with foster family and happy to parents during visits and enjoyed spending time with them).

Viewing the evidence in the light most favorable to the trial court's finding, we conclude the trial court could have formed a firm belief or conviction that termination of Father's parental rights was in Eva's best interest. *See In re J.F.C.*, 96 S.W.3d at 266.

Further, in view of the entire record, we conclude that the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or

conviction that termination of Father's parental rights was in Eva's best interest. *Id.*; *see also In re A.C.*, 560 S.W.3d at 631.

We overrule Father's challenge to the legal and factual sufficiency of the evidence supporting the trial court's finding that the termination of Father's parental rights was in Eva's best interest.

## Conclusion

We affirm the trial court's decree of termination.

Veronica Rivas-Molloy
Justice

Panel consists of Justices Rivas-Molloy, Gunn, and Caughey.